45 A.3d 788

**Dennis J. TETSO**

v.

**STATE of Maryland.**

No. 2219, Sept. Term, 2010.

Court of Special Appeals of Maryland.

June 4, 2012.

336

338

340

Nancy S. Forster, Towson, MD, for Appellant.

Cathleen C. Brockmeyer (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: MEREDITH, WATTS, and BERGER, JJ.

WATTS, J.

Following a trial held on August 17 and October 1, 6 through 8, 12 through 15, and 18 through 22, 2010, a jury sitting in the Circuit Court for Baltimore County convicted Dennis J. Tetso, appellant, of second-degree murder. *See* Md.Code Ann., Criminal Law Art. ("C.L.") § 2–204. On November 23, 2010, appellant was sentenced to thirty years' imprisonment with all but eighteen years suspended followed by five years of supervised probation. Appellant noted an appeal raising five issues, which we slightly rephrased as follows:

I. Was appellant denied the constitutional right to a fair and impartial jury and to the effective assistance of counsel when a *venire* member, who served on the jury, responded that she believed appellant should be required to prove his innocence?

II. Was the evidence insufficient to support appellant's conviction for second-degree murder?

III. Did the circuit court err in limiting appellant's questions of several witnesses that would have allegedly established that the victim had run away from home in the past and that the victim was seen by witnesses after the date on which the State claimed that she was murdered?

IV. Did the circuit court's instruction on circumstantial evidence constitute plain error?

V. Did the circuit court err in allowing the prosecutor to argue law in closing?

We answer all five questions in the negative, and therefore, affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant and Tracey Leigh Tetso ("Tracey")[1] were married in September of 2004, after a "six or seven year[ ]" relationship. The couple lived at 7800–A Bluegrass Road, Rosedale, Maryland 21237. On March 6, 2005, Tracey was to attend a Motley Crue concert with Christian Sinnott ("Christian"), that was scheduled to begin at 7:30 p.m. at the MCI Center in Washington, D.C. Tracey never arrived at the concert and has not been seen since March 6, 2005, and her body has not been discovered. On March 17, 2005, Tracey's vehicle, a Trans Am, was found in Anne Arundel County near a Days Inn hotel and a bowling alley. Appellant was arrested in June of 2009 and charged with first-degree murder.

_____

1. Tracey was born on March 21, 1971.

Because our resolution of the instant appeal involves the sufficiency of evidence, we must set forth the lengthy and detailed facts of the case. The facts are set forth below in the order the witnesses testified at trial.

At trial, Rose Smith, Tracey's grandmother, testified as the State's first witness, that she raised Tracey as her mother had been "gone since . . . Tracey was two years old." Smith testified that she and Tracey enjoyed a close relationship and that she talked to Tracey "at least three times a week" and saw her "[t]hree or four times a week." Smith testified that Tracey had three dogs and Tracey loved and cared for the dogs, talking about them all of the time. Smith testified that she had not seen or heard from Tracey since the week prior to March 6, 2005. Smith testified that, two to three months before Tracey disappeared, Tracey gave Smith a "document that [appellant] had written her." [2] After hearing about Tracey's disappearance, Smith testified that she went to appel-

---

**2.** The document was admitted into evidence as State's Exhibit No. 5, and was a letter written by appellant to Tracey, dated January 10, 2005, stating:

> *This is my contract and word to you*!!
> (Let me show you.)
> All I need is this chance.
> (1) I will forgive you and forget what happen[ed]
> (2) I will not di[s]cuss this matter ever again
> (3) I will treat you with respect & trust
> (4) I will help out around the house and give you money for the bills on the 1 of ever[y] month.
> (5) I will not give you a hard time about going out
> (6) *I love you and I will trust you till the day I die. And that[']s a promis[e].*
> All I ask is for you to care and commun[i]cate with me and b[e] my better half. Also let[']s put the marri[a]ge on hold until[ ] we are ready to agree. p.s. If I break this contract I will move out of your life for good so you can move on.
> Agree _____
> Disagree _____
> [signed by appellant]
> xoxo
> That[']s if you got any feelings for me.!!!!

At the top of the letter, appellant included a drop of what appeared to his own blood accompanied by the following language: "and yes this is my blood for a seal trust and com[m]itment."

lant's and Tracey's home on March 7, 2005, and she noticed that a comforter from Tracey's bed was missing. Smith testified that she went to appellant's and Tracey's home again about two weeks after Tracey's disappearance and when she arrived appellant was there, and "there was stuff piled up in the living room." Smith testified: "I asked [appellant] if he was moving out. And he said, No, I'm moving in, because I don't want to pay for that thing anymore." According to Smith, appellant was referring to a storage facility in which he had placed belongings prior to Tracey's disappearance.

Dawn Spadaro, Tracey's good friend and maid of honor, testified, as a witness for the State, that she saw Tracey "[m]aybe three times a week" and spoke to her "every other day or every two days." Spadaro testified that Tracey loved and took care of her Trans Am. Spadaro testified that Tracey "loved her pets. They were her babies." According to Spadaro, Tracey "was not happy in the marriage." Spadaro testified that in March 2005, she made plans to move into Tracey's home at the end of May 2005. Spadaro testified that Tracey told her that, on March 6, 2005, she was attending a Motley Crue concert with a friend from work, Christian. Spadaro testified that appellant called her the night after the concert to let her know that Tracey was missing. Spadaro subsequently conducted a search for Tracey's car, "[a]ll over Anne Arundel County," with no success.

Robin Payne, one of Tracey's co-workers at Aggregate Industries,[3] testified as a witness for the State, that she spoke with Tracey outside of work "maybe once a weekend." As to Tracey's work habits, Payne testified that she "always was at work, always on time, always dependable. If she had to stay, if she had to finish work she would not leave early that day. She would stay until her job was done." Payne testified that she knew Tracey had pets because "that's all she talked about.

---

3. Aggregate Industries is a concrete, sand, gravel and asphalt company. Tracey was employed as a dispatcher and worked in customer service. She would answer calls, take orders, dispatch trucks, and keep in contact with drivers on the radio.

They were like her kids, they were her babies." On cross-examination, Payne testified that appellant would call Tracey's work "asking what time did Tracey clock out last night. Because he was, like, watching her. And I [Payne] did payroll. So he would call and ask me a few times what time she clocked out the night before."

Monika Barilla, Tracey's supervisor at Aggregate Industries, testified as a witness for the State, that she spoke with Tracey everyday, except for the weekends. Barilla testified that Tracey was "[f]un loving, she loved, just loved life and loved her friends and her grandmother, her dogs. Her dogs were her children." Regarding Tracey's work ethic, Barilla testified that "Tracey was very reliable. She was one of the— one of our best coworkers. She always showed up. If for some reason she couldn't make it on time, Tracey would call. She would always call before she was late."

Barilla testified that she knew Tracey planned to attend the Motley Crue concert on March 6, 2005, and that this was marked on Tracey's calendar at work, with a note that she would be coming into work at nine the next day because of the concert. Barilla testified that on March 7, 2005, when Tracey did not show up to work or call, she called appellant and local hospitals looking for Tracey. Barilla testified that she conducted and assisted in at least thirteen searches for Tracey, as well as bringing media attention to her disappearance. Barilla testified that appellant, although invited, did not participate in any of these searches. Barilla testified that many news segments were shown regarding Tracey's disappearance— "probably two hundred times it's been out there over the years." Barilla testified that "Tracey couldn't go anywhere without [appellant] constantly calling her, asking where is she, who is she with, where is she going to be, how long is she going to be there. I know one time we went out to dinner and he was constantly calling. She would get really upset, which I don't blame her, you know. It wasn't just after things were breaking up, it was from the beginning."

As to Tracey's reliability in terms of communication, Alisha Baptiste, another of Tracey's co-workers at Aggregate Industries, testified as a witness for the State, that: "Tracey was very reliable. Any time we had plans to do something, if Tracey was going to be late she would call me to let [me] know that she was running behind." Baptiste testified that Tracey was going to the Motley Crue concert on March 6, 2005, with Christian, whom, according to Baptiste, Tracey was "[d]ating[.]" Baptiste testified that Tracey was planning to attend a party at her house a week after March 6, 2005.

Robin Cataldi, one of Tracey's good friends from high school, testified as a witness for the State, that she saw Tracey on March 3, 2005, and Tracey appeared as if she "was having a hard time." Cataldi testified that Tracey informed her that "she had gone to see a divorce attorney and that [she] and [appellant] were separating and she was moving on." Cataldi testified that Tracey told her that she "had already put things on layaway so that when [appellant] took things out of the house that she could just replace whatever he took." Cataldi testified that after Tracey's disappearance, she asked appellant about any plans Tracey had for after March 6, 2005. According to Cataldi, appellant responded that Tracey "had picked up Easter baskets for his children and they were having a birthday party for his daughter" on March 13, 2005.

Kathleen Sinnott, Christian's mother, testified as a witness for the State, that Christian died on March 12, 2010, from a drug overdose. Sinnott testified that in 2005, Christian lived with her and that Tracey was his girlfriend.[4] Sinnott testified that she learned Tracey was married because appellant "came to the house one time and I answered the door. Christian wasn't home. And he asked for Christian and I said that he wasn't home. And I didn't know [appellant], so I said to him, Can I have your name and tell him who stopped by? And he just turned and said, It's Tracey's husband. He didn't give the name; he just said 'Tracey's husband'." Sinnott testified

---

4. Sinnott testified that Christian was not using drugs in 2005.

that she knew Christian and Tracey were to go to a concert on March 6, 2005, but Tracey never showed up at her house.

Officer Angela Blankenship of the Baltimore County Police Department, testified as a witness for the State, that she has known appellant for eight years, as her husband and appellant "were friends." Officer Blankenship testified that in January 2005, appellant contacted her and "[a]t that time [appellant] advised [her] that [he] believe[d] it was his wife Tracey's—I want to say that it was her boss who had contacted him advising him that he had some tapes believing that she had an affair. And he also, he called me to say that someone was following him and he believed it may be the guy she was having the affair with. He said he was harassing him." As a result of this call, Officer Blankenship ran a tag number that appellant had provided to her. Officer Blankenship gave appellant information on the owner of the vehicle, including his date of birth, name and address because appellant said he wanted to obtain a peace order. According to Officer Blankenship, the owner of the vehicle appellant requested information about was Christian.

Dawn Howard, Tracey's best friend, testified as a witness for the State, that she spoke with appellant daily after Tracey's disappearance and he "showed no emotion." Howard testified that prior to Tracey's disappearance, she had planned to attend Howard's daughter's baby shower in April. According to Howard, while visiting with appellant after Tracey's disappearance, he gave her presents Tracey had bought for the baby shower. Howard testified that she was involved in searches "[e]very weekend for the first several months" and appellant, although invited, never participated because "he did not feel comfortable coming around people that thought he would do something to Tracey."

Regina Gardner, Tracey's stepmother, testified as a witness for the State, that she visited Tracey and appellant's home on April 4, 2005, with Smith, and she saw "boxes from the floor stacked up from the living room door back towards the dining area." When she asked appellant if he was moving out, he

replied no, he was moving back in. Gardner testified that she participated in searches about every weekend for a year and had fliers made. Gardner testified that the house at 7800–A Bluegrass belonged to Tracey, as she was the only one on the deed and "she was paying the mortgage."

Keith Liebermann, Tracey's supervisor at Aggregate Industries, testified as a witness for the State, that he worked with both Tracey and appellant, and had known appellant for about eighteen years. Liebermann testified that Tracey was a very reliable worker, and she would call or give advance notice if she was going to miss work or be late. Liebermann testified that in December 2004, appellant spoke with him about Tracey because "[h]e was suspicious of Tracey and wanted to know if [Liebermann] had ever heard anything[.]" Liebermann explained that he believed appellant was referring to Tracey "fooling around on him." Liebermann testified that appellant asked him if he ever "came across anything to let him know." Liebermann testified that he "came across" the following:

I was listening to—our phone calls are recorded. So I was, I was listening to tapes, and for personal reasons, and I came across this long phone call, so I decided to listen to it.

It was Tracey, and it was of her talking to some guy who I didn't know who it was at the time. And they were kind of talking, I would say, in code. They mentioned some things about a cell phone, getting a new card for more minutes and meeting at a specific location. Not the recent location, the first location. Something to that effect. And so I stopped listening at that point.

And then I don't know exactly what day after that I contacted [appellant] to let him know I found something he might be interested in hearing.

Liebermann testified that appellant wanted to hear the call and came in on a Saturday at the beginning of December to listen to the call. Liebermann testified that appellant "was antsy, kind of like pacing a little bit" and had brought a tape recorder with him to record the call, but Liebermann refused

to allow the recording. Liebermann testified that while in the office listening to the call, appellant went to Tracey's desk, opened a drawer, and found a small package and pulled out a bracelet and then put the package back in the drawer. Liebermann testified that appellant "wasn't happy." When asked if Liebermann determined who Tracey was calling, Liebermann replied: "in part of the call he stated that he didn't work that day. So, of course, at the time the call came in—they're time stamped. So we went over . . . [to] where the cut-off time sheets are for the drivers. . . . And all of the drivers worked except for this one driver, and his name was Christian Sinnott. So I came to the conclusion it was him as well as, I am sure, [appellant] did too." While listening to the call, Liebermann testified that appellant said "he wasn't going to go through this again and there's three things he doesn't like, he doesn't like a liar, a cheat, and he doesn't want anybody to take his money." Liebermann testified that Tracey found out about him letting appellant listen to the call, and that Tracey confronted him but he denied it. Tracey went to his supervisor, at which point Liebermann told the truth. Liebermann testified that the last time he spoke to appellant was the Wednesday after he let appellant listen to the call. Liebermann stated that appellant "call[ed] to tell me what was happening with his little investigative stuff," and Liebermann told him not to call anymore.

When asked what appellant was referring to when he said "investigative stuff," Liebermann replied: "He told me he had recorded the house phone. He went to Radio Shack picking up stuff. Just following her around. Parking—borrowing somebody's van to follow her around in." Liebermann testified that appellant told him he acquired Christian's address from "a lady police officer that helped him with the information." Liebermann testified that appellant confronted Christian:

> He went and confronted him the Saturday after he listened to the conversation and, what he told me, the following Monday. And he went there, I thought he told me, with some relatives or cousins.

And he did tell me he didn't know Christian had arms as big as his legs, which he didn't know.[5]

Anthony DeRuggiero, a supervisor at Precision Concrete, testified as a witness for the State, that he has known appellant for nine years as appellant works for Precision Concrete. DeRuggiero testified that, as an employee for Precision Concrete, appellant drives a single–axle dump-style truck with a trailer. According to DeRuggiero, appellant is an equipment operator—one who is able to operate the equipment, excavate, grade—and one who is able to operate backhoes, loaders, dozers, excavators, fork trucks, and the like. DeRuggiero testified that in March of 2005, Precision Concrete had about twenty-five ongoing projects, and appellant would have been aware of the location of the projects sites at the time. DeRuggiero testified that there are construction dump sites at fixed locations where "we take the excess materials, broken concrete, excess dirt, trash, any kind of construction debris goes to a construction dump." DeRuggiero testified that appellant had knowledge of these dump sites.

On cross-examination, DeRuggiero testified that not all of the project sites were gated and locked when not being worked on and that "most of them aren't gated." DeRuggiero testified that dump sites, however, cannot be accessed without somebody being on-site to let a visitor in. DeRuggiero testified that appellant had never, to his knowledge, removed a piece of equipment from Precision Concrete without authorization. DeRuggiero testified that trucks, but not the equipment, have GPS locating systems and drivers maintain a log to record their activities with the trucks. DeRuggiero testified that he had no knowledge of any truck or equipment being taken without authorization or missing in March of 2005.

John Royer, an employee of the Maryland Transportation Authority, and an E–ZPass Administrator, testified as a witness for the State, that the Baltimore County Police subpoenaed the E–ZPass records for Tracey from February through

---

5. Appellant did not cross-examine Liebermann.

March 6, 2005. The State introduced Exhibit No. 26–records for use of an E–ZPass that was in Tracey's name. Royer testified that the records reflect that on March 6, 2005, at 2:30 a.m., Tracey's E–ZPass was used to go northbound through the Baltimore Harbor Tunnel, located on the 895 corridor. Royer testified that the records show that Tracey's E–ZPass was again used at 7:48 p.m. on March 6, 2005, to go southbound through the Baltimore Harbor Tunnel.

David Haven, appellant's friend and best man, testified as a witness for the State, that he had a telephone conversation with appellant on March 6, 2005, about appellant borrowing a "car computer" to fix his truck. Haven testified that in March 2005, he worked at Cycle World in Brooklyn Park, and on March 6, 2005, appellant met him at Cycle World to pick up the "car computer." Haven testified that appellant arrived at Cycle World in Tracey's Explorer because his truck was not working. Haven testified that appellant asked him to come over to his (appellant's) home in Rosedale to help with the truck. Haven agreed and drove to appellant's home around 6:10 p.m. Haven testified that he helped appellant fix his car and that he stayed for about an hour. Haven testified that while at appellant's home, he went inside to use the restroom and did not see Tracey or hear a television. Haven testified that when he arrived and when he left the home, appellant's vehicle, Tracey's Explorer and Tracey's Trans Am were in the driveway.

Haven testified that he was familiar with the status of Tracey and appellant's relationship, and he was aware that appellant was in the process of moving out. Haven testified that he assisted appellant in moving "his stuff out to a storage unit." The prosecutor asked Haven whether he had a conversation with appellant after March 10, 2005, in which appellant informed Haven that he had not told the police that Haven came to the house on March 6, 2005. Haven responded: "Yes."

Detective Charles Gruss of the Baltimore County Police Department, an analyst of telephone records, testified as a

witness for the State and was accepted as an expert in the field of cellular telephone ("cell phone") tower linking and mapping. During Detective Gruss's testimony, the State introduced evidence regarding cell phone usage for the cell phones used by Tracey, appellant, and Christian. The records reveal that a total of seventeen calls were made on Tracey's cell phone on Sunday, March 6, 2005. The cell phone records for Tracey's phone showed it was traveling "south of Glen Burnie" around 2:25 a.m., "heading back toward[ ] the Baltimore area." The next call was at "roughly" 10:00 a.m. in the Rosedale area, and three calls after that, at 2:36 p.m., 2:56 p.m., and 3:00 p.m., were also in the Rosedale area. Detective Gruss testified that "there[ were] no more calls until roughly 7:48 p.m., and you can see that the phone is traveling in a south direction on the 895 corridor. . . . Then you see another [call] going towards the Brooklyn area of Anne Arundel County." According to Detective Gruss, "then you see several calls down in the Glen Burnie area." Detective Gruss testified that ten calls were made in an eleven-minute span, between 7:46 p.m. and 7:57 p.m.

Christian's cell phone records showed that one-hundred-fifty-two calls were made on his cell phone on March 6, 2005. One-hundred-forty-four of those calls were made to Tracey's phone; one-hundred-thirty-eight of those calls went straight to voice mail, which meant that the phone was "not on." According to Detective Gruss, fifty-four of the calls were made when Christian's phone was close to Bowie, Maryland. Detective Gruss testified that "the rest of the calls," *i.e.* ninety-eight calls, were made later in the evening from the Washington, D.C. area, "no further north than the Bowie area." Detective Gruss testified that based on the cell phone records from 7:30 p.m. to 11:30 p.m., the cell phone belonging to Christian was somewhere in the Washington, D.C. area when used.

Appellant's cell phone records for March 6, 2005, showed a total of fifteen calls, most of which were made in the Rosedale area of Baltimore County, where appellant lived. According to Detective Gruss, one or two of appellant's calls, however, were "following the 895 corridor, crossed over maybe into

Baltimore City like the Brooklyn area, then one down in the Glen Burnie area." One of those two calls was made at approximately 4:20 p.m. and the other at 4:38 p.m. Appellant's cell phone records showed that the last call he made on March 6, 2005, was made from the Gardenville area[6] at 8:55 p.m.

Michael Pruner, who owns the company that installed the security system at Days Inn on Ritchie Highway, testified that the time on the videotapes very commonly does not adjust to daylight savings time and sometimes the videotape "would be an hour off." During Pruner's testimony, the State entered into evidence State's Exhibit No. 35, a videotape from the Days Inn parking lot on March 6, 2005. The State played the videotape for the jury. It is undisputed that the Days Inn videotape shows a Trans Am vehicle pulling into the parking lot, parking, a person departing from the vehicle, walking away from the vehicle and then headlights on the vehicle flashing. The time displayed on the videotape as this occurs is 9:01 p.m. Pruner testified that as a result of the video recording never being changed by the property or his company to adjust for Daylights Savings Time, "it would be an hour off."

Donna Croop, an auto mechanic at Schaeffer and Strominger, testified as a witness for the State that a Schaeffer and Strominger invoice showed that on December 18, 2003, she programmed one keyless entry remote for Tracey's Trans Am vehicle.[7] On cross-examination, Croop was shown a second Schaeffer and Strominger invoice from December 18, 2003, showing that two keys to the Trans Am were purchased on that day. The second invoice did not include a keyless entry remote. On re-direct examination, Croop testified that the first Schaeffer and Strominger invoice displayed the notation "programmed customer supplied remote, singular." Croop

---

**6.** State's Exhibit 107, admitted into evidence at trial, is a map depicting the locations of the cell phone calls made from appellant's phone and shows Gardenville is a community adjacent to Rosedale.

**7.** On cross-examination, Croop agreed that she had no independent recollection of the transaction and, as such, there was a possibility that two remotes could potentially have been programmed.

testified that she "usually keep[s] very meticulous notes. Usually if it's more than one, I will put in the plural. Right here it says in the singular."

Detective Phillip Marll of the Baltimore County Police Department, Homicide Unit, Cold Case Unit, the primary detective in Tracey's homicide case, testified as a witness for the State that he interviewed appellant on three occasions, twice on March 9, 2005, and a third time on March 10, 2005. On March 9, 2005, at 1:00 p.m., Detective Marll interviewed appellant, for the first time, at his and Tracey's home.[8] Detective Marll testified that appellant told him that on March 6, 2005, he was working outside on his truck, and around 2:30 p.m. Tracey came home from a store.[9] After Tracey's return, appellant advised that he went inside the house and heard the television on a few times, but he did not actually see Tracey. Appellant told Detective Marll that after Tracey arrived home from the store, "he never saw or heard from her again."

During the first interview, appellant told Detective Marll that he never left the house that day or that evening. Appellant told Detective Marll that at about 6:00 p.m. or 6:30 p.m., he took a shower, and after exiting the shower, he noticed the front door was closed and locked, the television was off, and Tracey's Trans Am was gone. Detective Marll testified that

---

**8.** Corporal Christopher George of the Baltimore County Police Department, testified as a witness for the State, that he responded to a call at Tracey and appellant's home on March 7, 2005, at 8:44 p.m. for a missing person. According to Corporal George, appellant, one of Tracey's friends, and Tracey's grandmother were present when he arrived. Corporal George stated that he spoke with appellant, who was cooperative, and appellant advised him that Tracey was missing, that they were going through a divorce, and Tracey was seeing Christian. Appellant provided Corporal George with Christian's name and contact information.

**9.** Detective Carroll Bollinger, a homicide detective for the Baltimore County Police Department, testified as a witness for the State, that he went to the Walgreens on Philadelphia Road in the Rosedale area of Baltimore County to obtain videotape from March 6, 2005, to determine whether Tracey had been there. State's Exhibit 21 was admitted into evidence, and the videotape showed Tracey at the Walgreens on March 6, 2005.

appellant explained that he received a call from Payne the morning of the March 7, 2005, inquiring about Tracey's whereabouts, and he proceeded to call a neighbor to see if Tracey's car was in front of their house. He then called Tracey's cell phone, but the call went straight to voice mail. Appellant told Detective Marll that a private investigator, hired by some of Tracey's co-workers, had talked to him and informed him that Tracey was supposed to go to a concert on March 6, 2005, with Christian.

During the first interview, Detective Marll asked appellant about his marriage and appellant stated that he and Tracey were having "marital problems." Appellant told Detective Marll that he believed Tracey was "seeing someone else" so he "went to where [Tracey] worked and approached ... and asked Liebermann asking if it was okay to listen to her phone calls. He [appellant] said he did that, ... and searched through her desk. He said he also placed a tape recorder on her phone, unbeknownst to [Tracey], and recorded conversations between [Tracey] and Christian [ ]." Appellant showed Detective Marll a telephone bill with "hashmarks" next to Tracey's cell phone number and Christian's cell phone number. On the back of the phone bill was Christian's name, address, and phone number, as well as directions to Christian's residence. Appellant told Detective Marll he got this information from the internet.

During the first interview, appellant told Detective Marll that he and two of Tracey's cousins had approached Christian at his house, and Christian denied having an affair with Tracey. Appellant told Detective Marll that in February, 2005, he obtained a protective order against Christian because of a confrontation that occurred in a convenience store. On February 10, 2005, however, appellant had the protective order rescinded. Appellant informed Detective Marll that he was going to the court the next day to get another protective order against Christian because on March 7, 2005, Christian stopped by appellant's home and called appellant's cell phone asking about Tracey's whereabouts. Appellant told Detective Marll that he was moving out and had moved some belongings

to storage. Appellant gave Detective Marll contact informa- tion for some of Tracey's friends. Appellant gave Detective Marll contact information for Haven, telling Detective Marll that: "Dave Haven was the person he [appellant] had follow Tracey once he found out Tracey [ ] was having an affair." Appellant permitted Detective Marll to look around the house, and when Detective Marll went to their bedroom, appellant said Tracey's "cell phone charger was missing from the top of the jewelry box." On March 21, 2005, Detective Marll execut- ed a search warrant at Tracey and appellant's home, and during the search, recovered Tracey's cell phone charger.

Immediately after the first interview, Detective Marll ob- tained the cell phone records for Tracey, appellant, and Chris- tian.[10] The cell phone records showed that on March 6, 2005, appellant had made two calls from the northern Anne Arundel County area. Upon receiving the records, Detective Marll went back to interview appellant, again on March 9, 2005, as to why appellant had not told him that he left the house on March 6, 2005. During the second interview, appellant de- scribed March 6, 2005, as he had before, but, this time he informed Detective Marll that "he just remembered that he had left that day ... and went to northern Anne Arundel County." Appellant told Detective Marll that he went to Cycle World in Anne Arundel County to pick up a car "computer" from Haven and on the way home picked up bleach and laundry detergent from the Dollar General Store because, according to appellant, Tracey asked him to do so.

On March 10, 2005, Detective Marll conducted a third interview of appellant, and during this interview appellant told Detective Marll for the first time that Haven had come to his house on March 6, 2005. Detective Marll testified that he told appellant that things were not adding up, and it "seem[ed] like [Tracey] disappeared when she went in the residence" to which appellant immediately responded, "you can't say any-

---

**10.** Detective Bollinger testified that he obtained cell phone records for Tracey, appellant, and Christian.

thing happened here in the home."[11] Detective Marll testified that appellant then stated: "she drove her car through the tunnel at 7:48 p.m" to which, Detective Marll responded, "well, we don't know who was driving the car when it went through the tunnel." Appellant responded, "well, you can't say I was driving the car." At this point, appellant told Detective Marll that he "did not want the marriage to continue" and that "Tracey did not want a divorce at that time." Detective Marll testified that he questioned appellant about the letter dated January 10, 2005, which the State referred to as the "blood letter," and that appellant appeared to get "sort of angry[,]" so he "let that ride" to keep the lines of communication open.

Detective Marll testified about the recovery of Tracey's Trans Am on March 17, 2005. Detective Marll stated that the Trans Am was recovered in the 6600 block of Ritchie Highway and Pinpoint Street, in a parking lot that is shared by the Days Inn and the Ritchie Bowling Lanes. Detective Marll testified that this location is about one or one point two miles from Cycle World, the store that appellant acknowledged visiting on March 6, 2005, during the second interview. When recovered, the Trans Am was locked "and there was no outward damage on the car[.]"

Detective Marll contacted appellant to obtain a key to the vehicle. Detective Marll went to appellant and Tracey's home to get the key. Once there, appellant handed Detective Marll keys with the one remote to the vehicle in silence. After meeting with appellant, Detective Marll contacted the Days Inn for videotape footage.

Chief Inspector Richard Henry of the U.S. Marshal Service testified as a witness for the State, that, in an attempt to locate Tracey he ran Tracey's married and maiden names, along with her date of birth and Social Security number, through a number of data banks used to capture fugitives. Henry testified that he did not find any results. When asked

---

11. On cross-examination, Detective Marll testified that appellant stated: "Nothing happened to her in this home[.]"

hypothetically if Tracey "tried to obtain a license in another state using her name and date of birth and Social Security number, with you checking, . . . would that have turned up[,]" Henry responded: "Yes."

The State's last witness, Thomas Pittman, a general manager at Aggregate Industries, testified that he knew both appellant and Tracey. Pittman testified that on April 4, 2005, he was at a marina in Baltimore having a boat he intended to purchase inspected, when he ran into appellant. Pittman testified that he and appellant spoke, and when Pittman asked appellant what he was doing there, appellant responded, "looking for a boat, looking for a new toy, something to play with." Pittman testified that he did not discuss with appellant how he was going to pay for the boat, but Pittman testified: "He [appellant] did discuss that there was a life insurance policy on Tracey that he was the beneficiary of."

Appellant testified on his own behalf, that his employment history included working for "Jack Luskin, the cheapest guy in town, and then I [appellant] worked for Maryland Yamaha. I worked for E.L. Gardner Concrete, and I worked—and then they were bought out by Aggregate Industries. Now I'm working at Precision Concrete." Appellant testified that he has worked for Precision Concrete for ten years and he "haul[s] equipment around for them, lumber, materials, panels, and just haul[s] products to the jobs to get jobs set up to get started."

Appellant testified that he and Tracey had been together for about six or seven years and had been married for "not even a year" in March of 2005. Appellant testified that on March 6, 2005, he left his home using "Tracey's truck to go pick up the computer to work on my truck." Appellant testified that he was worse off financially after Tracey disappeared. Appellant testified that he had belongings in storage lockers, and when Tracey did not come back, he moved "the one that was most expensive, the indoor one, back to the house to try to save [his] money[.]"

Appellant testified that there were two sets of keys to Tracey's Trans Am, one set which was kept in the house as a spare set. Appellant testified that he did not participate in all of the searches for Tracey. Appellant acknowledged that he did not participate in the first search "[c]ause the first search was my parent's property. They accused me right off the bat." According to appellant, he removed flyers because "[t]hey were on [his] mailbox," front porch, and car. Appellant acknowledged that he told police that he got Christian's address from the internet when he actually obtained the address from his friend, Officer Blankenship, because he did not want Blankenship to lose her job. Appellant testified that he made a call from his house to his aunt around 8:55 p.m. on March 6, 2005.

Appellant testified about meeting with Tracey's boss, Liebermann. According to appellant, he met with Liebermann on a Saturday at the Aggregate Industries office, and Liebermann "let [appellant] listen to phone conversations. And then I went over to [Tracey's] desk . . . opened up the drawer and there was a box in there containing" "a necklace or bracelet." Appellant testified that, after his meeting with Liebermann, he tapped his and Tracey's home phone. Appellant specifically testified that he did not drive Tracey's Trans Am through the tunnel on March 6, 2005.

On cross-examination, appellant testified that he had moved to Towson about two or three months before trial, and he lives with his new girlfriend, whom he had been dating for "[a]bout three years." Appellant acknowledged that he had Tracey followed, had tapped their home phone, had used his friend's vehicle to follow Tracey at least once, and had "snooped around her phone and looked through to see who she was calling." Appellant testified that Tracey and he were married in September, and by December, he knew Tracey was having an affair. Appellant acknowledged that Tracey had asked him to leave and appellant testified that he found a place but "the house wouldn't be ready until March 30th." Appellant admitted that he lied to Tracey about Liebermann letting him listen to her work calls. Appellant testified that the letter he wrote

to Tracey on January 10, 2005, had his blood on it, as the result of his "pick[ing] a scab on [his] arm and a piece of blood dripped on[.]"

### *Voir Dire*

During voir dire, the circuit court asked:

Does any member of this panel have any difficulty in accepting and applying the rule of law that [appellant] is presumed to be innocent?

\* \* \*

The State has the burden of proving [appellant] guilty beyond and to the exclusion of any reasonable doubt. This burden of proof never shifts to him. He does not have to testify, he does not have to present any evidence, he does not even have to argue or interpose objections. He can sit before you mute saying and doing nothing at all during the entire trial. And if the State does not prove to you beyond and to the exclusion of any reasonable doubt that he is guilty, you must find him innocent.

Is there any member of this panel who's unable to accept this legal principle?

No juror responded affirmatively to these questions. The circuit court then asked: "Is there any member of this panel who thinks that [appellant] should be required to prove his innocence?" Juror No. 289 responded affirmatively by standing up. Following this question, the circuit court asked: "Is there any member of this panel who believes that they would be unable to give [appellant] a fair and impartial trial based upon a personal opinion about the criminal justice system or the judicial system[,]" to which Juror No. 289 did not respond affirmatively.

Juror No. 289 was subsequently called to the bench for individual questioning, at which time the following exchange occurred:

THE COURT: Ma'am, you say that you have some friends or family involved in law enforcement?

[JUROR NO. 289]: I do. I did. My father-in-law was a Baltimore City policeman, my brother-in-law was a State trooper, and my best friend's husband was a Baltimore City policeman. . . .

THE COURT: Okay. Did you also say that you had some friends or family members that went to law school?

[JUROR NO. 289]: My brother-in-law is an attorney.

THE COURT: And where does he practice?

[JUROR NO. 289]: He practices in Harford County.

THE COURT: What does he do? If you know.

[JUROR NO. 289]: Family.

THE COURT: Okay. Any questions, counsel?

[JUROR NO. 289]: And I have—oh, I forgot. I have a close friend who is a judge in Baltimore County that's also family court.

THE COURT: Who's that?

[JUROR NO. 289]: Tim Martin.

THE COURT: Okay. Any questions, counsel?

\* \* \*

[APPELLANT'S COUNSEL]: Would the fact that you've had some close relations with—I don't know if that's the right word, close in-laws, whatever, in the city police and State troopers, would that affect your ability if there are going to be police officers who testify, a detective in this case, would be able to separate your—I hope you like your relatives—from being able to just weigh totally and fairly the evidence regardless of whether they're wearing a badge or a uniform?

[JUROR NO. 289]: I'm not absolutely sure that I could say that for absolute certainty. You know, not sure.

[PROSECUTOR]: Would you give it your best shot?

[JUROR NO. 289]: I would. I would for sure.

\* \* \*

[APPELLANT'S COUNSEL]: ... If it's part of my job to call a police officer a liar on the stand, would that offend you?

[JUROR NO. 289]: No, depending on the circumstance.

\* \* \*

[JUROR NO. 289]: Also I failed to stand I do contribute to a victim—I contribute to My Sister's Place. I failed to stand for that.

THE COURT: Do you work with them?

[JUROR NO. 289]: I did work with Catholic Charities. I no longer work with them, but I contribute.

THE COURT: Okay. Anything else?

[PROSECUTOR]: No.

Thank you ma'am.

[APPELLANT'S COUNSEL]: Thank you.

Juror No. 289 was subsequently accepted by the State and appellant's counsel, without objection, and seated as Juror No. Nine. The entire jury, with Juror No. 289 seated as Juror No. Nine, was accepted by appellant's counsel without objection.

### Significant Cross-Examination

During the cross-examination of Gardner, Tracey's step-mother, the following occurred:

[APPELLANT'S COUNSEL]: Did she [Tracey] have runaway problems with you all?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

During the cross-examination of Detective Marll, the following occurred:

[APPELLANT'S COUNSEL]: Now, did you have occasion during the course of your investigation to interview an individual named Matthew Kerr?

[DETECTIVE MARLL]: Yes, sir, I did.

[APPELLANT'S COUNSEL]: Where did that occur? In Pennsylvania?

[DETECTIVE MARLL]: Yes, sir, it did.

[APPELLANT'S COUNSEL]: And that was a result of a phone call that was received by Baltimore County Police Department with regard to this case, correct?

[DETECTIVE MARLL]: That's correct.

[APPELLANT'S COUNSEL]: And you went and interviewed Mr. Kerr about [Tracey] being in Pennsylvania?

[PROSECUTOR]: Objection, your Honor.

THE COURT: Sustained.

[APPELLANT'S COUNSEL]: Where is Mr. Kerr now?

[DETECTIVE MARLL]: He's in Pennsylvania.

[APPELLANT'S COUNSEL]: He's locked up, isn't he?

[DETECTIVE MARLL]: Not [that] I know of—

[APPELLANT'S COUNSEL]: He's in jail?

[DETECTIVE MARLL]: He is—he was locked up in 2005. I know that much. I don't know if he [is] locked up anymore.

[APPELLANT'S COUNSEL]: Kevin Warner, that was somebody you also wanted to talk to in the Kerr situation; isn't that correct?

[DETECTIVE MARLL]: No, not after I had my second talk with him and then I spoke to his attorney, no.

[APPELLANT'S COUNSEL]: Now, did you ever go out and interview a Thomas Tyler?

[DETECTIVE MARLL]: Oh, yes, sir, I did.

[APPELLANT'S COUNSEL]: And that was another in regard to this, a report of [Tracey] in this case, a report of [Tracey]—

[PROSECUTOR]: Objection, Your Honor.

THE COURT: Sustained.

## Motions for Judgment of Acquittal

At the close of the State's case-in-chief, appellant's counsel moved for judgment of acquittal arguing that "[t]here is no evidence here of premeditation, there's no evidence that [Tra-

cey] died of a criminal act[.]" The circuit court denied the motion.

At the close of evidence, appellant again moved for judgment of acquittal, stating:

> And I want to renew my motion for judgment of acquittal now at the end of all the evidence. It's a different standard. Doesn't go in the light most favorable to the State.
>
> \* \* \*
>
> We make a motion for judgment of acquittal at the end of all the evidence now. No longer does the State get the benefit of having Your Honor apply the standard of taking the evidence in the light most favorable to the State. And I would argue strenuously at this time, without doing the same thing I did before earlier this morning, but I argue strenuously under the different standard, there's absolutely no evidence of premeditation.

The circuit court denied the motion.

## Jury Instructions

At the conclusion of the evidence and prior to closing arguments, the trial judge discussed jury instructions with counsel, and the following exchange occurred regarding the instruction as to direct and circumstantial evidence:

THE COURT: Okay. And how about State's Number 6? [12]

[APPELLANT'S COUNSEL]: We agree with State's Number 6 with the modification that we gave to Ethan about just 15 minutes ago, which you have already included a D as modified request.

THE COURT: All right. That modification, [prosecutor], I believe you received a copy.

[PROSECUTOR]: I have a copy.

THE COURT: The sentence regarding *Williams v. State?*

---

12. The State's proposed jury instruction as to direct and circumstantial evidence was listed as Number Six. Appellant's proposed jury instruction as to direct and circumstantial evidence was listed as Number Seven.

[PROSECUTOR]: I think the additional language that we set forth sets the standard or states it in a much more objective fashion than the manner in which it is stated in Counsel's requested modification. And the *Williams* case, I'm not even sure, frankly, if *Williams* says specifically that. I just ask—our modification is much more objective in modification and states the law without a slant to it, so I would object to [appellant's] modification.

[APPELLANT'S COUNSEL]: Your Honor, that's a direct quote from *Williams*. I know he didn't say it went, but it's a direct quote from *Williams*. We'd push that be put in there because—

THE COURT: With the decision, it's *Hebron versus State* at 331 Md.App. [Md.] 219 [627 A.2d 1029], one paragraph, you don't object to that, [appellant's counsel]?

[APPELLANT'S COUNSEL]: No, Your Honor.

THE COURT: All right. Your objection is noted, [prosecutor]. I'm going to add *Williams versus State* as presented by the Defense in their Request Number 7.

The circuit court instructed the jury, in pertinent part, as follows:

It is your duty as jurors to follow the law as I state to you and to apply the law to the facts as you find them from the evidence that you've heard in this case. You are not to single out any one instruction as stating the law, but must consider the instructions as a whole. You must not be concerned with the wisdom of any rule of law stated by me regardless of any opinion that you may have as to what the law is or ought to be.

It would be a violation of your duty to base your verdict upon any view of the law other than that given by me in these instructions. It would also be a violation of your sworn duty to base your verdict upon anything other than the evidence that you've heard in this case.

\* \* \*

The Defendant is presumed to be innocent of the charges. This presumption remains with the Defendant throughout

every stage of the trial and is not overcome unless you're convinced beyond a reasonable doubt that the Defendant is guilty.

The State has to prove him—excuse me. The State has the burden of proving the guilt of the Defendant beyond a reasonable doubt. This burden remains on the State throughout the trial. The Defendant is not required to prove his innocence. However, the State is not required to prove guilt beyond all possible doubt or to a mathematical certainty. Nor is the State required to negate every conceivable circumstance of innocence.

\* \* \*

Opening statements and closing arguments of the lawyers are not evidence in this case. They're intended only to help you understand the evidence and to apply the law. . . .

There are two types of evidence, direct and circumstantial. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence.

Circumstantial evidence need not be such that no possible theory other than guilt can stand. It is not necessary that the circumstantial evidence exclude every possibility of the Defendant's innocence, or produce an absolute certainty of guilty. While it must afford a basis for an inference of guilty beyond a reasonable doubt, it is not necessary that each circumstance standing alone be sufficient to establish guilt, but the circumstances are to be considered collectively.

In reaching a verdict, you should weigh all of the evidence presented, whether direct or circumstantial. You may not convict the Defendant unless you find that the evidence, when considered as a whole, establishes guilt beyond a reasonable doubt.

A conviction based upon circumstantial evidence alone is not to be sustained unless the circumstances taken together

are inconsistent with any reasonable hypothesis of inno-cence.

After the instructions were given, appellant's counsel stated at a bench conference: "For the record, the Defense would object to what we consider to be the incomplete spoliation instruction and incomplete circumstantial evidence instruction, which were already argued before in open court." The circuit court responded: "Objection is noted and preserved." The State noted no objections.

## Closing Remarks

During closing arguments, the following occurred:

[PROSECUTOR]: The unlikelihood of such a voluntary disappearance is evidence—it's circumstantial evidence that you can give weight to. The law says that you can give it weight equal to that of blood stains of evidence—

[APPELLANT'S COUNSEL]: Objection. May we approach the bench on that?

THE COURT: Come on up.

(Whereupon, counsel approached the bench without the Defendant.)

THE COURT: I don't know if you know, the screen up here is on.

[APPELLANT'S COUNSEL]: I don't think it's proper in closing argument in Maryland to cite case law that you haven't instructed the jury on.

[PROSECUTOR]: It's proper law. It's not a bad statement of law. He put in—

THE COURT: He can argue the law.

[PROSECUTOR]: Thank you, Your Honor.

[APPELLANT'S COUNSEL]: It's a 1982 cite.

THE COURT: You're arguing concealment on this issue.

[PROSECUTOR]: I'll turn that off for Your Honor.

THE COURT: Okay.

(Whereupon, counsel returned to their respective trial tables.)

THE COURT: Folks, if you're wondering why [appellant's counsel] is up here, I told him to stand up here so he can see the screen.

[APPELLANT'S COUNSEL]: Thank you, Your Honor.

[PROSECUTOR]: As I was saying, Your Honor, that evidence of unlikelihood of involuntary disappearance is circumstantial evidence that you can use. Don't discount it. That's important.

As I was saying, this statement was written in 1982. Why is—is that significant? That's before the advent of cell phones and Internet. Think of how much harder it would be to go underground and start a new life and not pop up on a search such as that. That's evidence that you can take to the bank.

Again, lack of a found body, it's evidence. You can [infer] death was caused criminally. If it was caused naturally, it's highly unlikely that she would dispose of her own body. That's just another way of stating common sense.

If not 15 minutes ago, I'm confident by now we can all agree Tracey's no longer with us, Tracey is dead.

[APPELLANT'S COUNSEL]: Your Honor, I object to him putting Maryland law up on the screen. He's not supposed to argue the law, he's supposed to argue the facts.

THE COURT: It's closing argument. Overruled.

## DISCUSSION

### I. Juror No. 289

### A. Bias

Appellant contends that he was denied the right to an impartial jury because in response to a *voir dire* question, Juror No. 289—who served on the jury—indicated that she believed appellant should be required to prove his innocence. Appellant argues that his counsel and the circuit court failed to ensure the impaneling of an impartial jury by not striking or questioning further Juror No. 289. Appellant asserts that the *voir dire* "plainly exposed [Juror No. 289's] actual bias in

her clearly held belief that [appellant] had an obligation to prove his innocence." Appellant maintains that even if the circuit court "had no *sua sponte* obligation to strike [Juror No. 289] for cause, [appellant's] counsel most certainly did and his failure to do so amounts to ineffective assistance of counsel[.]" In a reply brief, appellant argues that the record is sufficient to demonstrate ineffective assistance of counsel as the only reason for appellant's trial counsel's inaction was that he "purposefully put a biased juror on the jury, or, defense counsel failed to take note of the juror's obvious bias."

The State responds that appellant's claim that Juror No. 289's presence on the jury deprived him of a fair trial is not properly before this Court because appellant's counsel had twenty peremptory challenges and used only fifteen, and appellant has failed to ask for plain error review. Alternatively, the State contends that the circuit court did not err in failing to *sua sponte* strike prospective Juror No. 289, and asks this Court to decline to address appellant's contention that his counsel rendered ineffective assistance of counsel in failing to strike Juror No. 289.

A criminal defendant has the right to trial by an impartial jury. U.S. Const. amend. VI, XIV; *Owens v. State,* 399 Md. 388, 405, 924 A.2d 1072 (2007), *cert. denied,* 552 U.S. 1144, 128 S.Ct. 1064, 169 L.Ed.2d 813 (2008). *Voir dire* is the means by which to "identify and challenge unqualified jurors[.]" *Owens,* 399 Md. at 402, 924 A.2d 1072. As the Court of Appeals described:

> The purpose of voir dire is to ensure and secure a defendant's right to a fair and impartial trial by permitting the selection of a jury comprised of venirepersons who do not hold preconceived notions or biases that would affect the outcome of the trial. As we have said, in pursuit of this goal, a trial court must question the venire and consider whether any of the answers reveals such a bias. Any question likely to elicit disqualifying information must be asked. Failure to do so taints the objectivity and thus

impartiality of the jury, with negative implications for the defendant's right to a fair trial.

*Moore v. State,* 412 Md. 635, 664, 989 A.2d 1150 (2010) (citation omitted). "Bias is a question of fact, the existence of which is a matter left to the trial judge, the focal point in the process, whose predominant function in determining juror bias involves credibility findings whose basis cannot be discerned from an appellate record." *Williams v. State,* 394 Md. 98, 113, 904 A.2d 534 (2006) (citations and internal quotation marks omitted). The standard of review for such findings is abuse of discretion. *Moore,* 412 Md. at 654, 989 A.2d 1150.

▆▆▆ Prospective jurors are presumed to be unbiased, and the challenging party has the burden of proof to overcome that presumption. *Hunt v. State,* 345 Md. 122, 146, 691 A.2d 1255, *cert. denied,* 521 U.S. 1131, 117 S.Ct. 2536, 138 L.Ed.2d 1036 (1997). "If a criminal defendant undertakes to challenge a juror on grounds of bias, the attack must be affirmatively advanced at the time of trial." *Id.* "Should an unqualified juror be impanelled, courts are satisfied generally with the verdict when the record establishes that the juror did not evade intentionally disqualification and that his or her service was performed without bias." *Owens,* 399 Md. at 425 n. 45, 924 A.2d 1072 (citations omitted).

▆▆▆ In the present case, appellant has failed to preserve an issue as to the selection of Juror No. 289 for appellate review. Juror No. 289 was impaneled as the ninth juror. Juror No. 289 answered the following *voir dire* question affirmatively—"[i]s there any member of this panel who thinks that [appellant] should be required to prove his innocence"— but was not asked follow-up questions by appellant's counsel or the trial judge regarding this response. The record reflects that after responding affirmatively to general *voir dire* questions, jurors were called to the bench for individual or follow-up questions. Juror No. 289 was called to the bench and asked individual questions. Appellant's counsel failed to ask Juror No. 289 any individual questions regarding her response to the question at issue. After the individual ques-

tioning was completed, appellant's counsel accepted Juror No. 289 **without objection** upon the request of the courtroom clerk to impanel the juror. Prior to the completion of jury selection, appellant's counsel was asked whether the entire jury, with Juror No. 289 impaneled as Juror No. Nine, was acceptable to the defense, to which appellant's counsel replied: "The jury is acceptable to the Defense."

As the State points out, appellant's counsel had twenty peremptory challenges and he failed to use all twenty. *White v. State*, 300 Md. 719, 728, 481 A.2d 201 (1984), *cert. denied*, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985) ("If disqualification for cause is improperly denied, but the accused has not exercised all allowable peremptory challenges, there is no reversible error."); *Larch v. State*, 201 Md. 52, 57, 92 A.2d 463 (1952) ("It is a general rule that if a party knows a cause of challenge and does not take it at the proper time,—that is, while the jury is being impanelled,—he cannot avail himself of the defect afterwards." (citations and internal quotation marks omitted)). Here, appellant not only failed to use his allotted twenty peremptory challenges, but he also: (1) failed to object that no individual questions were asked of Juror No. 289 as to her affirmative response to the question regarding appellant's requirement to prove his innocence by the trial court; (2) failed to ask individual follow-up questions himself; (3) affirmatively accepted Juror No. 289 for impaneling on the jury; and (4) affirmatively accepted the jury with Juror No. 289 as a member. As such, appellant has not preserved any issue as to Juror No. 289's inclusion on the jury for appellate review.

Nonetheless, we shall briefly address the merits of appellant's complaint. Appellant contends that the record demonstrates that Juror No. 289 was actually or presumptively biased because she responded affirmatively to the *voir dire* question—"[i]s there any member of this panel who thinks that [appellant] should be required to prove his innocence?" We disagree two-fold because: (1) the record does not substantiate that Juror No. 289 was actually or presumptively biased and (2) the trial judge was not required to *sua sponte*

ask further questions of Juror No. 289. We first point out that during *voir dire,* Juror No. 289 was asked numerous *voir dire* questions, including the following:

Does any member of this panel have any difficulty in accepting and applying the rule of law that [appellant] is presumed to be innocent?

\* \* \*

The State has the burden of proving [appellant] guilty *beyond and to the exclusion of any reasonable doubt.* This burden of proof never shifts to him. He does not have to testify, he does not have to present any evidence, he does not even have to argue or interpose objections. He can sit before you mute saying and doing nothing at all during the entire trial. And if the State does not prove to you beyond and to the exclusion of any reasonable doubt that he is guilty, you must find him innocent.

Is there any member of this panel who's unable to accept this legal principle?

\* \* \*

Is there any member of this panel who believes that they would be unable to give [appellant] a fair and impartial trial based upon a personal opinion about the criminal justice system or the judicial system?

Juror No. 289 did not respond affirmatively to any of these questions. The question to which Juror No. 289 responded affirmatively asked: "Is there any member of this panel who thinks that [appellant] should be required to prove his innocence?" The question did not inquire as to whether this is the standard the juror would employ in deciding the case. Juror No. 289's lack of response to *voir dire* questions concerning an inability to accept the rule of law that the defendant is presumed innocent and the State having the burden to prove the defendant guilty beyond a reasonable doubt with that burden never shifting to the defendant, renders nugatory appellant's contention that Juror No. 289 was actually or presumptively biased.

Recently, in *Alford v. State,* 202 Md.App. 582, 602–04, 33 A.3d 1004 (2011), we reviewed *Dingle v. State,* 361 Md. 1, 759 A.2d 819 (2000), and unambiguously held that the statement by the Court of Appeals in *Dingle,* that it is the task of the trial judge to impanel a fair and impartial jury, does not stand for the proposition that a trial court automatically commits reversible error in failing to, *sua sponte,* ask follow-up questions of a juror.[13] As we explained in *Alford,* 202 Md.App. at 602–03, 33 A.3d 1004:

> In *Dingle,* the Court of Appeals held that the trial court erred in asking two-part *voir dire* questions. 361 Md. at 8–9 [759 A.2d 819]. The two-part *voir dire* consisted of the trial court asking the jury panel whether any juror had experiences, such as having been a victim of a crime,[14] or associations, such as being associated with police officers,[15]

---

**13.** At oral argument, appellant's counsel contended that a recent opinion, *Washington v. State,* 425 Md. 306, 40 A.3d 1017 (2012) is controlling. We disagree, as *Washington* is distinguishable. In *Washington,* the Court of Appeals held that the trial court did not abuse its discretion in refusing to ask whether any prospective juror would be more likely to believe a witness solely by virtue of the witness having served in the military or being employed by the military. Noting that "we give substantial deference to a trial judge's conduct during voir dire[,]" the Court concluded that this question did not directly relate to the crime charged, any of the witnesses who testified, or the defendant. The Court's holding in *Washington* addressed the propriety of the *voir dire* question, not the trial court's duty to ask follow-up questions of prospective jurors.

**14.** The *voir dire* question was phrased as follows:

> Have you or any family member or close personal friend ever been the victim of a crime, and if your answer to that part of the question is yes, would that fact interfere with your ability to be fair and impartial in this case in which the state alleges that the defendants have committed a crime?

*Id.* at 4 n. 4 [759 A.2d 819] (quotations omitted).

**15.** The *voir dire* question was phrased as follows:

> Are any of you or your family members or close personal friends associated with members of any law-enforcement agency, like the Baltimore County Police Department, the Baltimore City Police Department, the Federal Bureau of Investigation, the Maryland State Police, the Secret Service? That's part A.

and whether these experiences or associations would affect the juror's ability to be a fair and impartial juror. *Id.* at 3–4 [759 A.2d 819]. The Court of Appeals held that the *voir dire* procedure usurped the court's responsibility to ascertain the existence of cause for disqualification because the procedure allowed "the individual venire person to decide his or her ability to be fair and impartial." *Id.* at 9–10, 21 [759 A.2d 819]. The Court of Appeals stated that:

> Because [the trial judge] did not require an answer to be given to the question as to the existence of the status or experience unless accompanied by a statement of partiality, the trial judge was precluded from discharging his responsibility, *i.e.* exercising discretion, and, at the same time, the petitioner was denied the opportunity to discover and challenge venire persons who might be biased.

> The effect on the petitioner is particularly egregious: as we have seen, the party who would challenge a venire person for cause has the burden of presenting facts demonstrating the disqualification. As already pointed out, the strike for cause process encompasses the situation where the motion to strike is made on the basis of information developed during the voir dire process, not simply where the prospective juror admits an inability to be fair and impartial. Without adequate voir dire, there simply can be no such showing. The ability to challenge for cause is empty indeed if no way is provided for developing or having access to relevant information. What the dissent said in *Davis* [*v. State*, 333 Md. 27, 633 A.2d 867 (1993) ] applies just as forcibly to the case sub judice:

> "When the inquiries that constitute proper voir dire are restrictively interpreted, so that the voir dire process does not produce any information other than that which is

---

Part B of the question, and if you are so associated, would that fact interfere with your ability to be fair and impartial if you were seated as a juror in this case?
*Id.* at 4 n. 4 [759 A.2d 819] (quotations omitted).

automatically disqualifying, the defendant may be deprived of the right to a fair and impartial jury; he or she is completely at the mercy of the good faith, objectivity, and astuteness of the individual venirepersons. I believe that it is an abuse of discretion for the court to so restrict the *voir dire* process."

*Id.* at 17–18 [759 A.2d 819] (some internal citations and quotations omitted). To be sure, in *Dingle,* the Court of Appeals stated "the trial judge is charged with impaneling of the jury and must determine, in the final analysis, the fitness of the individual venire persons." 361 Md. at 8, 759 A.2d 819. The Court of Appeals made the statement under circumstances in which jurors were allowed to determine whether they had the ability to be fair and impartial before responding affirmatively to general voir dire questions.

(Footnotes in original).

In this case, we note, as we did in *Alford,* 202 Md.App. at 603–04, 33 A.3d 1004, that the trial judge did not employ the compound question format used in *Dingle.* Here, the trial judge specifically asked jurors to stand if they answered the question posed affirmatively. Prior to beginning the jury selection process, the trial judge advised the jury pool, in the presence of counsel, that: "After we've gone through all the questions, everybody that stands up for one or more questions will be invited up here to explain their answer. And while you're here, you may be asked some additional questions by the attorneys or me." As such, the trial judge provided the opportunity for appellant to ask individual questions of Juror No. 289, explore the juror's qualifications and potential bias, and challenge the juror.

In sum, appellant has not preserved an issue for review concerning Juror No. 289 as he failed to object in any manner to the court not questioning the juror regarding her affirmative response that appellant should prove his innocence, and agreed that Juror No. 289 was acceptable to the defense. We see no merit in appellant's contentions that the record demonstrates Juror No. 289 was "actually or presumptively biased"

and that the circuit court had an obligation to *sua sponte* conduct questioning of or strike Juror No. 289.

## B. Structural Error

Next, appellant contends that the failure of counsel and the circuit court to ask follow-up questions of Juror No. 289 regarding her affirmative response to the question—"[i]s there any member of this panel who thinks that [appellant] should be required to prove his innocence"—was structural error. Again, we disagree. Initially, we observe that appellant, by failing to object, has not preserved an issue as to structural error. *See Savoy v. State*, 420 Md. 232, 243 n. 4, 22 A.3d 845 (2011) ("[U]n-preserved structural errors are not automatically reversible, but, instead, are subject to plain error review." (Citations omitted.)).

Nonetheless, we perceive no error. In *Alston v. State*, 177 Md.App. 1, 13–14, 934 A.2d 949 (2007), *aff'd*, 414 Md. 92, 994 A.2d 896 (2010), this Court discussed structural error, stating:

> In *Arizona v. Fulminante*, 499 U.S. 279, 309–10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991), the Supreme Court held that if an error in a criminal trial is considered a structural error or defect, a reviewing court cannot apply the harmless error standard. A structural defect or error is one that "affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself[,] . . . . [and] 'transcends the criminal process.'" *Id.*, 499 U.S. at 310–11, 111 S.Ct. at 1265. Trial defects that the Supreme Court has held to be structural error include: deprivation of the rights to counsel at trial, to an impartial judge, to self-representation, and to a public trial, as well as unlawful exclusion of members of the defendant's race from a grand jury. *See id.*, 499 U.S. at 310, 111 S.Ct. at 1265. The types of trial error that the Supreme Court has held **not** to be structural include the admission of an involuntary confession, a defendant's statements obtained in violation of the Sixth Amendment or the Fourteenth Amendment, and an out-of-court statement by a non-testifying co-defendant. *See id.*, 499 U.S. at 309–311, 111 S.Ct. at 1265.

. . .

In *Redman v. State*, 363 Md. 298, 304 n. 5, 768 A.2d 656 (2001), a capital murder case, our Court of Appeals pointed out that structural error was found only in limited circumstances:

As in the presumed prejudice cases, the Supreme Court has found an error to be structural and subject to automatic reversal in a very limited number of cases. Moreover, in those cases where the Supreme Court, and indeed other courts, have found structural error mandating automatic reversal, the errors appear to be of constitutional magnitude. Such defects include a defective reasonable doubt instruction, racial discrimination in grand jury selection, denial of a public trial, total deprivation of counsel, and a judge who is not impartial. (Citations omitted.)

(Alterations and emphasis in original); *see also Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) ("Indeed, we have found an error to be 'structural,' and thus subject to automatic reversal, only in a 'very limited class of cases.'" (citations omitted)). In *Alston*, 177 Md.App. at 27, 934 A.2d 949, where the defendant alleged the trial court erred when the jury was not sworn until the State completed its case, we found no structural error, stating that: "The jury was instructed, before hearing any evidence, that it must listen carefully to the evidence and that its verdict must be based solely on the evidence. It was then sworn before it began deliberations. To conclude that this was structural error would logically mean that we believe that taking the oath is a prerequisite to listening. We do not hold that view." This Court, therefore, held that it "will not presume prejudice, and a harmless error analysis is appropriate." *Id.* In *Alston*, 414 Md. at 105, 109, 994 A.2d 896, the Court of Appeals affirmed the defendant's convictions, determining that a belated administration of the oath to the jury, although error, was subject to a harmless error analysis.

As gleaned from *Alston* and *Neder*, structural error, which, if preserved, is subject to automatic reversal, has been

found only in a very limited class of cases, and this is not one of those cases. Failing to ask a juror follow-up questions has not been held to be structural error by the Supreme Court or Maryland appellate courts. As we discussed above, Juror No. 289's response to the question at issue, when assessed in context of the responses to other *voir dire* questions, does not lead to the conclusion that Juror No. 289 was actually or presumptively biased. We perceive no error, "structural" or otherwise.

## C. Ineffective Assistance of Counsel

The right to counsel includes the right to the effective assistance of counsel. *Denisyuk v. State*, 422 Md. 462, 465–66, 30 A.3d 914 (2011) (citing *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper function-ing of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Judicial scrutiny of counsel's performance must be highly deferential . . . [and, for fairness, must] evaluate the conduct from counsel's perspective at the time [of the alleged deficient representation]." *Id.* at 689, 104 S.Ct. 2052.

In Maryland, a defendant's attack of a criminal con-viction on the basis of ineffective assistance of counsel general-ly takes place at post-conviction review, where the opportunity for further fact-finding exists. *Mosley v. State*, 378 Md. 548, 558–59, 836 A.2d 678 (2003) ("[A] post-conviction proceeding pursuant to the Maryland Uniform Post Conviction Procedure Act, Maryland Code, § 7–102 of the Criminal Procedure Arti-cle (2001), is the most appropriate way to raise the claim of ineffective assistance of counsel.") (footnote omitted). In *Ad-dison v. State*, 191 Md.App. 159, 174–75, 990 A.2d 614, *cert. denied*, 415 Md. 38, 997 A.2d 789 (2010), we stated that:

The Court of Appeals has repeatedly stated that the "desirable procedure" for presenting claims of ineffective

assistance of counsel is through post-conviction proceedings. *Johnson v. State,* 292 Md. 405, 434, 439 A.2d 542 (1982) (citation and internal quotations omitted); *see also, e.g., Ware v. State,* 360 Md. 650, 706, 759 A.2d 764 (2000). In *Johnson,* the Court of Appeals explained:

> In essence, it is because the trial record does not ordinarily illuminate the basis for the challenged acts or omissions of counsel, that a claim of ineffective assistance is more appropriately made in a post conviction proceeding[.] Moreover, under the settled rules of appellate procedure, a claim of ineffective assistance of counsel not presented to the trial court generally is not an issue which will be reviewed initially on direct appeal, although competency of counsel may be raised for the first time at a [ ] post conviction proceeding. Upon such a collateral attack, there is presented an opportunity for taking testimony, receiving evidence, and making factual findings concerning the allegations of counsel's incompetence. By having counsel testify and describe his or her reasons for acting or failing to act in the manner complained of, the post conviction court is better able to determine intelligently whether the attorney's actions met the applicable standard of competence.

(Alterations in original). In *Mosley,* 378 Md. at 566, 836 A.2d 678, this Court discussed the exceptional instances in which an ineffective assistance of counsel claim may be raised on direct appeal, stating:

> The rare instances in which we have permitted direct review are instructive, because they indicate our willingness to entertain such claims on direct review only when the facts in the trial record sufficiently illuminate the basis for the claim of ineffectiveness of counsel. As we explained in *In re Parris W.,* [363 Md. 717, 727, 770 A.2d 202 (2001),] direct review is an exception that applies only when "the critical facts are not in dispute and the record is sufficiently developed to permit a fair evaluation of the claim."

In this case, appellant seeks to raise an ineffective assistance of counsel claim for the first time on direct appeal where the opportunity for further fact-finding does not exist. As noted above, the record fails to establish that Juror No. 289 was actually or presumptively biased, and this is a not a case involving structural error. We conclude, therefore, as we stated in *Addison*, 191 Md.App. at 175, 990 A.2d 614, "[w]here, as here, the record sheds no light on why counsel acted as he did, direct review by this Court would primarily involve the perilous process of second-guessing, perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions." (Citation omitted). The record in the instant matter sheds no light on the reasons for appellant's counsel not asking follow-up questions of Juror No. 289. The record is equally unclear as to the reason for counsel's failure to object to Juror No. 289's impanelment and his acceptance of the entire jury with Juror No. 289 as a member of it.

Counsel's failure to ask follow-up questions and to object may have been part of a strategy to obtain Juror No. 289 in lieu of other members of the panel, whom he may have deemed to be less desirable. For example, although Juror No. 289 responded affirmatively that she held the belief that appellant should prove his own innocence, counsel's assessment may have been that this was a belief that the juror could put aside, based on the juror's responses to other *voir dire* questions.[16] As discussed above, Juror No. 289 did not re-

---

16. By way of comparison, as the State points out, Juror No. 361, for whom counsel's motion to strike for cause was denied, was impaneled without objection as Juror No. Four. Juror No. 361, during individual questioning at the bench stated that: "I think I also have a couple biases about some of the stuff that's needs to be talked about.... Well, first, I don't know, I just guess if you're pulled in for a court case, like, that's kind of where there's smoke, there's fire situation. And you just don't bring somebody in unless there's some good evidence that there's guilty—some, some guilt. I guess that's really the only thing." When asked by appellant's counsel: "Another way to way say this is you're not starting from the presumption that my client—you're not presuming he's innocent, your presuming there's some evidence that he might by guilty, correct[,]" Juror 361 responded: "I guess that's one way to say

spond affirmatively to other *voir dire* questions, including whether she would have difficulty in accepting and applying the rule of law that appellant is presumed to be innocent. The potential validity of the ineffective assistance of counsel claim cannot be determined without the opportunity for fact-finding during a post-conviction proceeding. Accordingly, we will not review the issue on direct appeal.

## II. Sufficiency of Evidence

### A. Preservation

Appellant contends that the evidence is insufficient to sustain his conviction for second-degree murder. Appellant argues "given that the State's case was based on entirely circumstantial evidence which was contradicted by other evidence supporting innocence, the circuit court erred in denying [his] motion for judgment of acquittal and sending the case to the jury." Appellant asserts that "nothing presented by the [S]tate, even when considered in its totality, leads to a conclusion, beyond a reasonable doubt, that Tracey's death was a homicide or that [appellant] is the criminal agent." Appellant maintains that in this case there was "no confession, no admission, no forensic evidence, no eyewitnesses, and no body" and, as such, "nothing short of speculation and conjecture can explain the guilty verdict in this case[.]" [17]

---

it, yeah." After individual questioning of Juror 361 revealed this response, and a motion to strike for cause was denied, appellant's counsel did not exercise a peremptory challenge for the juror. Based on this record, it is impossible to discern whether the acceptance of Jurors No. 289 and No. 361 was trial strategy.

17. On brief before this Court, appellant identified the following evidence as having been relied on by the State at trial:

1. Tracey's ties to her grandmother, friends, and dogs demonstrates she would not just disappear without a trace.

2. Tracey was excited to attend the Motley Crue concert on March 6, 2005.

3. Tracey's future plans to attend a baby shower and adult toy party belie a planned disappearance.

4. The deterioration of [appellant]'s marriage to Tracey as exhibited in recorded phone calls.

5. The small number of cell phone calls to Tracey's phone made by appellant after March 6, 2005.

6. Appellant's financial difficulties should he have to move from the marital home.

7. Tracey's affair with Christian Sinnott of which [appellant] became aware in December of 2004.

8. [Appellant]'s first statement to Detective Marll omitting reference to seeing David Haven on March 6, 2005.

9. The discovery of Tracey's car in Glen Burnie within two miles of Cycle World where [appellant]'s friend, David Haven worked.

10. The 7:48 p.m. call from Tracey's cell phone made while traveling southbound through the Harbor Tunnel and the claimed time on the video from Days Inn if one accounts for daylight savings time being 8:01.

11. A life insurance policy for Tracey.

12. [Appellant] was seen ripping down a flyer seeking help in finding Tracey.

13. [Appellant] had a remote key to the Trans Am and provided it to Detective Marll. The State claims there is only one remote key to the car.

(Transcript citations omitted).

In an apparent attempt to demonstrate the insufficiency of the evidence, appellant provided the following list of points ostensibly rebutting the State's evidence:

1. The Days Inn video is so unclear that one cannot even tell the "gender ... race or any other distinguishing characteristics of the person emerging from ..." the car.

2. The time on the Days Inn video clearly shows it to be 9:01 p.m. Cell phone records for [appellant] show that he made a call to his aunt from his home in Rosedale. The [S]tate failed to introduce any evidence that proved the video was an hour behind.

3. Detective Marll admitted that he received several calls stating that Tracey was seen after March 6.

4. No forensic evidence was found in [appellant] and Tracey's home. No forensic evidence was found in [appellant's] truck. No forensic evidence was found in [appellant]'s storage facility.

5. Fingerprints that did not belong to [appellant] were found on Tracey's car.

6. [Appellant] was not charged until four years after Tracey's disappearance.

7. Detective Marll lied in saying that he needed a key to get into Tracey's car because an evidence technician broke into her car using a hanger while it was on the lot of the Days Inn.

8. Detective Marll first claimed that he had destroyed all of his notes of his interviews with witnesses only to later discover the notes. The only notes that appeared to be destroyed were those of the detective's interviews with [appellant].

9. Detective Marll lied when he state[d] that [appellant] originally told him he never left his home on March 6 as demonstrated by the detective's inconsistent testimony in this regard during the motions hearing.

The State responds that the issue is not properly before this Court as appellant moved for judgment of acquittal at the end of the State's case arguing that the evidence was insufficient, but failed to renew the argument as to second-degree murder in moving for judgment of acquittal at the close of evidence. Alternatively, the State contends that the evidence was sufficient to support the conviction for second-degree murder.[18]

10. Detective Marll had been labeled "deceptive" by the Court of Appeals in its opinion reversing the capital conviction of Clarence Conyers and [appellant] was permitted to enter this fact into evidence.

11. [Appellant] testified that it was not unusual for Tracey to not come home when she went out with friends.

12. [Appellant] tore down fliers that were placed on his car and his mailbox.

13. [Appellant] did not participate in all of the searches because he "was accused ... right off the bat."

14. Tracey and her friends drank and bowled at the bowling alley that shares the parking lot with Days Inn.

15. Their marriage had deteriorated because Tracey was having an affair with Christian Sinnott and [appellant] was going to move out of the house at the end of March.

16. [Appellant] introduced a receipt showing that Tracey purchased two keys and transmitters for the Trans Am in December, 2004.

17. The technician at Schaeffer and Strominger testified that she had no independent recollection of actually programming only one remote but was basing her testimony solely on the print out shown to her that had the words "program cust supplied remote." She admitted that she was not the person who wrote the notation on the invoice and that she originally told Detective Marll that she programmed two remotes.

18. [Appellant] never collected any insurance money as the policy Tracey had was tied to the mortgage and, in fact, the house was foreclosed.

19. The small scratch marks on [appellant]'s neck were caused by a necklace he always wore and he introduced photographs taken during his wedding, seven months earlier which show the same small scratches on his neck.

20. Tracey's friend Monika Barilla testified that Tracey always got "really mad if she knew [appellant] was looking for her."

(Transcript citations omitted) (omissions in original).

18. In its brief before this Court, the State identifies the following evidence as being sufficient to support the conviction:

[1.] [Appellant] and Trac[e]y were in a deteriorating marriage and a reason for the deteriorating marriage was [appellant]'s continued efforts to monitor Trac[e]y's activities, including—tapping her telephone, speaking to her supervisors, listening to recorded phone

Maryland Rule 4–324(a) provides, in pertinent part: "A defendant may move for judgment of acquittal on one or more counts, or on one or more degrees of an offense which by law is divided into degrees, at the close of the evidence offered by the State and, in a jury trial, at the close of all the evidence. The defendant shall state with particularity all reasons why

---

messages, following her and confronting a man with whom Trac[e]y was having an extra-marital affair[.]

[2.] [Appellant], who had frequent phone conversations with Trac[e]y prior to March 5, 2005, discussing the status of their marriage and his desire to continue the marriage, made minimal efforts to contact Trac[e]y after March 5, 2005, and never participated in any search for her[.]

[3.] [Appellant], despite agreeing to move out of Trac[e]y's home did not do so before her disappearance because, according to him, he was unable to afford a new living arrangement was seen, shortly after Trac[e]y's disappearance, unpacking his personal belongings in her home[.]

[4.] Less than a month before Trac[e]y's disappearance, [appellant], who claimed to be the beneficiary of a life insurance policy on Trac[e]y, was seen shopping for a large boat[.]

[5.] When [appellant] was questioned about his activity the day Trac[e]y disappeared, he gave police a statement that neglected to mention that, earlier that day, he had driven to David Haven's place of business, which was near the location where Trac[e]y's vehicle was recovered[.]

[6.] [Appellant] did not mention that Haven had visited him at Trac[e]y's home earlier that day, in subsequent statements he also volunteered that "nothing happened" in the home and that no one could say that he was driving her car[.]

[7.] [Appellant]'s statement that Trac[e]y and her Trans Am were gone around 6:30 p.m. on March 6, 2005, when he exited the shower conflicted with David Haven's statement that he arrived at Trac[e]y's house around 6:10 p.m. and, at that time, [appellant] was working on his truck and that when he left around an hour later, Trac[e]y's Trans Am was still in the driveway[.]

[8.] Video surveillance footage, which was viewed by the jury, captured an image of someone leaving Trac[e]y's vehicle in the parking lot shared by a bowling alley and a Days Inn in Anne Arundel County around 8:00 p.m. on March 6, 2005, and that the car's headlights flashed several seconds later[.]

[9.] Days later, [appellant] was in possession of the only remote that was programmed for the vehicle[.]

[10.] According to Trac[e]y's grandmother, who went into Trac[e]y's home the day she was reported missing, the comforter from Trac[e]y's bed was missing, and days after Trac[e]y disappeared, [appellant] was observed to have had scratches on his neck[.]

(Transcript citations and footnote omitted).

the motion should be granted." "The language of the rule is mandatory." *State v. Lyles,* 308 Md. 129, 135, 517 A.2d 761 (1986); *see generally State v. Rich,* 415 Md. 567, 574, 3 A.3d 1210 (2010).

■■■ In *Anthony v. State,* 117 Md.App. 119, 126, 699 A.2d 505, *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997), this Court stated:

> In a criminal action, when a jury is the trier of fact, appellate review of sufficiency of evidence is available only when the defendant moves for judgment of acquittal at the close of all the evidence and argues precisely the ways in which the evidence is lacking. The issue of sufficiency of the evidence is not preserved when appellant's motion for judgment of acquittal is on a ground different than that set forth on appeal.

(Citations omitted). A defendant may not argue in the trial court that the evidence was insufficient for one reason, then urge a different reason for the insufficiency on appeal in challenging the denial of a motion for judgment of acquittal. *Graves v. State,* 94 Md.App. 649, 684, 619 A.2d 123 (1993), *rev'd on other grounds,* 334 Md. 30, 637 A.2d 1197 (1994).

In *Warfield v. State,* 315 Md. 474, 488–89, 554 A.2d 1238 (1989), the Court of Appeals determined that this Court erred in finding that the defendant had failed to preserve for appellate review his claim that the evidence was insufficient to sustain his convictions. In *Warfield,* the defendant moved for judgment of acquittal at the end of the State's case-in-chief, stating with particularity all reasons why the motion should be granted. *Id.* at 486, 554 A.2d 1238. The motion was denied and the defendant moved at the close of evidence stating: "I would renew—renew my Motion for Acquittal on all three Counts." *Id.* at 486–87, 554 A.2d 1238. The trial judge again denied the motion. The Court of Appeals held that:

> When a party makes anew a motion for judgment at the conclusion of all the evidence and states that the motion is based upon the same reasons given at the time the original motion was made, or when a party "renews" a motion for

judgment and thereby implicitly incorporates by reference the reasons previously given, the reasons supporting the motion are before the trial judge. If, for any reason, the judge desires that the reasons be restated, the judge may simply say so, and the moving party must then state the reasons with particularity. If the judge does not wish the reasons restated, he or she may proceed to decide the motion on the grounds previously advanced. Obviously, when the moving party wishes to advance new or different reasons at the time the second motion is made, that party may do so, but should be careful to state whether the reasons being advanced are in lieu of or in addition to the reasons previously given.

We caution, however, that it would be far better for the defendant to place on the record that his reasons are the same as previously stated, and set out such further reasons he may have, but we do not think the intent of the rule is that he must be denied a review of the evidence for failure to do so. There is a sharp distinction to be drawn between cases in which reasons have not been particularized on either motion, and cases in which adequate reasons were given to support the first motion but not expressly set out for the second motion. In short, the withdrawal of a motion by the offering of evidence by the defendant does not kill it. It may be resurrected by renewing it, and the renewal will usually incorporate the reasons previously given.

*Id.* at 487–88, 554 A.2d 1238.

■ To begin, we conclude that the issue of sufficiency of evidence for appellant's conviction is not preserved for appellate review. We note initially that in moving for judgment of acquittal at the conclusion of the State's case, appellant's counsel failed to argue with particularity that the evidence was insufficient to support a conviction for second-degree murder. Appellant's counsel moved for judgment of acquittal at the end of the State's case, arguing, in pertinent part, that:

It's a one count indictment, Your Honor, as you know, but it's a statutory form indictment for murder. And I would

argue the following: That the law in Maryland is very clear that to prove **premeditated first-degree murder,** the State must adduce evidence that the Defendant possessed the intent to kill, that the Defendant had conscious knowledge of that intent, there was time enough for the Defendant to deliberate and time enough to have thought it out, that intent has to be premeditated and deliberate.

* * *

So as to **first-degree murder,** Your Honor, what's the evidence here of **first-degree murder?** There is none. . . .

* * *

**As to first-degree murder, and I'm going to argue second-degree murder later, but since I thought it would be the easiest thing for the Court to go one step at a time, . . .**

(Emphasis added). After hearing from counsel, the circuit court denied the motion for judgment of acquittal.

Although in making the motion for judgment of acquittal after the State's case, appellant's counsel stated: "As to first-degree murder, and I'm going to argue second-degree murder **later,**" the record unequivocally reflects that counsel failed to subsequently argue that the evidence was insufficient to sustain a conviction for second-degree murder. In other words, in spite of announcing an intent to address the offense of second-degree murder "later," appellant's counsel failed to do so. Although the State concedes in its brief before this Court that appellant moved for judgment of acquittal at the end of the State's case arguing that the evidence was insufficient as to second-degree murder, the record demonstrates otherwise.[19] We are not bound by the State's concession. In our

---

19. At oral argument, when asked to identify the point during the motion for judgment of acquittal at the conclusion of the State's case when appellant's counsel argued insufficiency of the evidence as to second-degree murder, appellant's counsel failed to locate any place in the record where trial counsel "later" argued that the evidence was insufficient to support a conviction of second-degree murder. When asked to do so, appellant's counsel responded that trial counsel argued overall

view, appellant's counsel failed to argue the insufficiency of evidence as to second-degree murder during the motion for judgment of acquittal at the end of the State's case, and the issue was not preserved at that point.

After the denial of the motion for judgment of acquittal at the end of the State's case, appellant presented a defense, testifying on his own behalf. At the close of evidence, appellant moved for judgment of acquittal stating:

> And I want to renew my motion for judgment of acquittal now at the end of all the evidence. It's a different standard. Doesn't go in the light most favorable to the State.
>
> * * *
>
> We make a motion for judgment of acquittal at the end of all the evidence now. No longer does the State get the benefit of having Your Honor apply the standard of taking the evidence in the light most favorable to the State. And I would argue strenuously at this time, without doing the same thing I did before earlier this morning, but I argue strenuously under the different standard, there's absolutely no evidence of premeditation.

Upon review, we conclude that appellant's counsel specifically limited the motion for judgment of acquittal at this point to the lack of evidence of premeditation. Appellant's counsel stated that he wanted to "renew" the motion "without doing the same thing I did before earlier this morning . . . there's absolutely no evidence of premeditation." As Maryland Rule 4–324(a) provides, in pertinent part: "The defendant shall state with particularity all reasons why the motion should be granted." Here, appellant's counsel unambiguously stated: "And I would argue strenuously at this time, **without doing the same thing I did before earlier this morning,** but I argue strenuously under the different standard, there's absolutely no evidence of premeditation." (Emphasis added). At

---

that the evidence was inconsistent with murder in any degree. As set forth above, the record demonstrates trial counsel argued with particularity a lack of evidence as to first-degree murder and failed to address the sufficiency of evidence as to second-degree murder.

this juncture, appellant failed to preserve for review an issue of sufficiency of evidence as to second-degree murder by limiting the motion for judgment of acquittal to the lack of evidence of premeditation. The element of premeditation is necessary for a conviction of first-degree murder. *See* C.L. § 2–201(a)(1) ("A murder is in the first degree if it is: (1) a deliberate, premeditated, and willful killing[.]"). The defendant was convicted of second-degree murder, an offense that does not require premeditation. *See* C.L. § 2–204 ("A murder that is not in the first degree under § 2–201 of this subtitle is in the second degree.").[20] Equally as important, appellant's

---

**20.** Maryland Criminal Pattern Jury Instruction 4:17, entitled: "Homicide–First Degree Premeditated Murder and Second Degree Specific Intent Murder (No Justification or Mitigation Generated)," provides as follows:

The defendant is charged with the crime of murder. This charge includes first degree murder and second degree murder.

A

FIRST DEGREE MURDER

First degree murder is the intentional killing of another person with wilfulness, deliberation, and premeditation. In order to convict the defendant of first degree murder, the State must prove:

(1) that the conduct of the defendant caused the death of (victim); and

(2) that the killing was wilful, deliberate, and premeditated.

Wilful means that the defendant actually intended to kill the victim. Deliberate means that the defendant was conscious of the intent to kill. Premeditated means that the defendant thought about the killing and that there was enough time before the killing, though it may only have been brief, for the defendant to consider the decision whether or not to kill and enough time to weigh the reasons for and against the choice. The premeditated intent to kill must be formed before the killing.

B

SECOND DEGREE MURDER

Second degree murder is the killing of another person with either the intent to kill or the intent to inflict such serious bodily harm that death would be the likely result. **Second degree murder does not require premeditation or deliberation.** In order to convict the defendant of second degree murder, the State must prove:

(1) that the conduct of the defendant caused the death of (victim); and

(2) that the defendant engaged in the deadly conduct either with the intent to kill or with the intent to inflict such serious bodily harm that death would be the likely result.

(Emphasis added).

counsel could not renew what he did not earlier have—a motion for judgment of acquittal on particularized grounds as to second-degree murder made at the conclusion of the State's case. In sum, the record reveals that appellant's counsel failed to argue at the conclusion of the State's case, and at the conclusion of evidence, that the evidence was insufficient to support a conviction for second-degree murder. As such, appellant has not preserved an issue on appeal as to the sufficiency of evidence for second-degree murder.

## B. The Merits

Notwithstanding appellant's failure to preserve the issue, viewing the evidence in the light most favorable to the State, we are satisfied that the evidence was sufficient for a rational trier of fact to determine beyond a reasonable doubt that appellant committed the crime of second-degree murder.

### (i) Standard of Review

"We affirm the denial of a motion for acquittal unless we determine that no rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt." *Neal v. State,* 191 Md.App. 297, 306, 991 A.2d 159, *cert. denied,* 415 Md. 42, 997 A.2d 792 (2010). "When a motion for judgment of acquittal is made in a jury case it is the function of the lower court to determine whether or not the evidence before it is sufficient in law to sustain a conviction." *Vuitch v. State,* 10 Md.App. 389, 396, 271 A.2d 371 (1970), *cert. denied,* 404 U.S. 868, 92 S.Ct. 44, 30 L.Ed.2d 112 (1971) (citations and internal quotation marks omitted).

The standard for our review of the sufficiency of the evidence is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We defer to the fact finder's opportunity to assess the credibility of witnesses, weigh the evidence, and resolve conflicts in the evidence[.] While we do not re-weigh the evidence, we do determine whether the verdict was supported by sufficient evidence, direct or cir-

cumstantial, which could convince a rational trier of fact of the defendant's guilt of the offenses charged beyond a reasonable doubt.

The same review standard applies to all criminal cases, including those resting upon circumstantial evidence, since, generally, proof of guilt based in whole or in part on circumstantial evidence is no different from proof of guilt based on direct eyewitness accounts. Circumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused.

Furthermore, the fact finder, not the appellate court, resolves conflicting evidentiary inferences. The primary appellate function in respect to evidentiary inferences is to determine whether the trial court made reasonable, *i.e.*, rational, inferences from extant facts. Generally, if there are evidentiary facts sufficiently supporting the inference made by the trial court, the appellate court defers to the fact-finder[.]

*Neal,* 191 Md.App. at 314–15, 991 A.2d 159 (citations and internal quotation marks omitted).

### (ii) *Corpus Delicti* & Sufficiency of Evidence

In *Lemons v. State,* 49 Md.App. 467, 468, 433 A.2d 1179 (1981), the defendant appealed his first-degree murder conviction, arguing that there was insufficient evidence to support the conviction because there was not "adequate evidence of *corpus delicti* independent" of the defendant's statements.[21]

---

**21.** In *Lemons,* the defendant told various people that he murdered Debbie Kelly, giving graphic details. *Id.* at 474–76, 433 A.2d 1179. The defendant gave a written statement to police confirming his previous account. *Id.* at 476, 433 A.2d 1179. The State introduced evidence of drawings made by the defendant depicting his account of murdering the victim. *Id.* at 477, 433 A.2d 1179. The defendant later told police that his version of the offense and the drawings were just hallucinations and dreams he made up. *Id.* at 477, 433 A.2d 1179. At trial, a psychiatrist testified that, in his opinion, the defendant was schizo-

This Court reversed the conviction, holding that "a defendant's extrajudicial confession standing alone is, as a matter of law, insufficient to support a criminal conviction." *Id.* This Court stated that: "In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone." *Id.* at 473, 433 A.2d 1179 (citation and internal quotation marks omitted). In reversing the conviction, we held that the only evidence "which is both independent and 'corroborative'" of the defendant's confession/statement was that the victim failed to return to work. *Id.* at 485–86, 433 A.2d 1179. We concluded that:

In every Maryland case reported thus far involving the corroboration rule in the context of a homicide, the victim's body had been recovered and there was other independent evidence, either direct or circumstantial, to suggest that the death was not the result of accident or suicide. *See, e.g., Miller v. State,* 251 Md. 362, 247 A.2d 530 (1968); *Hadder [v. State], supra* [238 Md. 341, 209 A.2d 70 (1965) ]; *Jones [v. State], supra* [188 Md. 263, 52 A.2d 484 (1947) ]. This, of course, does not imply that the inability to produce a body is an insuperable obstacle, in itself, to the obtention and sustention of a murder conviction. **This Court, as well as the Court of Appeals, has repeatedly said that the independent evidence of the *corpus delicti* "may be circumstantial in nature when direct evidence is not available,"** *Miller, supra* at 382 [247 A.2d 530]; *Franklin v. State,* 8 Md.App. [134,] at 140, [258 A.2d 767 (1969) ], **and there is no reason to believe that this statement does not apply to the fact of death with the same force as it does to the criminal causation....** Nevertheless, it is clear from these cases that there must be independent evidence, at least circumstantial in nature, that relates to both elements of the *corpus delicti.* Thus, the problem in the present case is not

phrenic and that he was insane at the time he was talking to police. *Id.* at 479, 433 A.2d 1179.

that the State failed to produce [the victim's] body, for if she was, in fact, murdered as [the defendant] described, there would be no body to produce; rather, the problem here is that the State failed to adduce sufficient evidence, even of a circumstantial nature, that [the victim] is dead much less murdered.

*Id.* at 486–87, 433 A.2d 1179 (emphasis added).

In *Hurley v. State,* 60 Md.App. 539, 542–43, 483 A.2d 1298 (1984), *cert. denied,* 302 Md. 409, 488 A.2d 500 (1985), the defendant appealed his manslaughter conviction, arguing that there was insufficient evidence of *corpus delecti* to support the conviction. In *Hurley,* this Court affirmed the defendant's conviction, noting that the State produced evidence of:

(1) the last time [the victim, the defendant's wife] was seen alive by her daughter; she heard a scream and saw her mother on the floor of [defendant's] office;

(2) the [defendant's] own inconsistent statements concerning his wife's disappearance, *i.e.,* his inability to account for his activities for several hours the night she disappeared; his persistent denial of washing his truck despite the testimony of two eyewitnesses to the contrary; his involvement in repossessing her car; and his comments to a secretary that certain rugs were seized as a result of the investigation when none were, in fact, taken by police;

(3) [the victim's] relationship with [the defendant];

(4) [the victim's] character and patterns of behavior; and

(5) the lack of activity on [the victim's] bank accounts and credit cards and lack of contact with family members, friends and governmental agencies.

*Id.* at 553, 483 A.2d 1298.

In *Hurley,* we stated that: "As the California Court of Appeals succinctly stated: 'The fact that a murderer may successfully dispose of the body of the victim does not entitle him to acquittal. That is one form of success for which society has no reward.'" 60 Md.App. at 550, 483 A.2d 1298 (citing *People v. Manson,* 71 Cal.App.3d 1, 139 Cal.Rptr. 275 (1977)). This Court explained that, "'independent evidence of the

*corpus delicti* may be circumstantial in nature when direct evidence is not available,' even where the circumstantial evidence applies to the fact of death.'" 60 Md.App. at 550, 483 A.2d 1298 (citing *Lemons,* 49 Md.App. at 486, 433 A.2d 1179). This Court stated that proof of a victim's "habits and her failure to contact family members and friends" "is essential where, as here, no body is produced." *Id.* at 552, 483 A.2d 1298. Quoting the Supreme Court of Virginia in *Epperly v. Commonwealth,* 224 Va. 214, 294 S.E.2d 882 (1982), this Court stated:

> Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, 'go underground,' and remain out of touch with family and friends. **The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence.**

*Hurley,* 60 Md.App. at 552, 483 A.2d 1298 (emphasis added).

More recently, in *Riggins v. State,* 155 Md.App. 181, 186–87, 843 A.2d 115, *cert. denied,* 381 Md. 676, 851 A.2d 595 (2004), the defendant appealed his first-degree murder conviction, arguing that there was insufficient evidence to sustain the conviction because there was no body or any other physical evidence indicating that a murder occurred. In *Riggins,* we held that:

> Notwithstanding the absence of physical evidence in this case to establish the *corpus delicti* of the crime, the circumstantial evidence established that: the victim was close to her family, most especially her daughter; the victim had not been heard from in five years, despite an exhaustive record and document search in addition to national media awareness of the disappearance; the victim was aware of appellant's ongoing affair with Cole; the victim had stated that she was going to report the affair to the police; the victim was going to leave appellant; prior to the victim's disappearance, appellant had asked co-workers about killing a person and disposing of the body; appellant had asked

friends about obtaining a gun; appellant had stated to Cole that "he wanted to kill [the victim]," stating that he would either "shoot" or "strangle her," and "put her body in the truck with the waste," where "nobody would ever find her"; appellant stated that the victim "wasn't coming back"; and appellant had conspired to fabricate an alibi. Moreover, on the night of the victim's disappearance, the evidence indicated that appellant left work early to meet with Cole. Cole then observed appellant go to his house. There was clearly sufficient independent evidence that the victim had been murdered to corroborate appellant's confession to David Marshall.

155 Md.App. at 214–15, 843 A.2d 115 (alteration in original). We explained that:

In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone. **The State may establish the *corpus delicti* by either direct or circumstantial evidence.** The *corpus delicti* of the crime of murder is ordinarily established through the presence of the victim's body and by direct evidence establishing that death resulted from criminal activity. **Although it is certainly more difficult to establish the *corpus delicti* of homicide when the victim's body is missing, it is not impossible.**

*Id.* at 211–12, 843 A.2d 115 (citations and internal quotation marks omitted) (emphasis added).

In *Riggins*, this Court held that even without appellant's alleged confession, the evidence was sufficient to affirm the conviction of first-degree murder, stating: "Even in the absence of the statements to David Marshall and John McKenny, we are satisfied that the circumstantial evidence in this case would have permitted a rational trier of fact to determine, beyond a reasonable doubt, that appellant committed the crime of first degree murder." *Id.* at 215–16, 843 A.2d 115.

 Returning to the case at hand, after reviewing the evidence in the light most favorable to the prosecution, we conclude that the evidence was sufficient to permit a rational trier of fact to determine beyond a reasonable doubt that appellant committed the crime of second-degree murder.[22] As this Court stated in *Lemons*, 49 Md.App. at 473, 433 A.2d 1179: "In a homicide case the proof of the *corpus delicti* is sufficient if it establishes the fact that the person for whose death the prosecution was instituted is dead, and that the death occurred under circumstances which indicate that it was caused criminally by someone." (Citation and internal quotation marks omitted). Viewing the evidence in the light most favorable to the State, Tracey's complete disappearance from the face of the earth, lack of contact with friends and family, non-use of credit cards or bank accounts, and the inability,

---

**22.** In this case, we find no merit in appellant's contention that under *Hebron v. State*, 92 Md.App. 508, 608 A.2d 1291 (1992) aff'd, 331 Md. 219, 627 A.2d 1029 (1993), the "charge should not have been sent to the jury[.]" In *Hebron*, 92 Md.App. at 512, 608 A.2d 1291, we held that the trial court did not err in refusing to instruct the jury, in a case involving only circumstantial evidence, that "if you [i.e., the jury] can draw more than one reasonable inference from the circumstantial evidence, then [appellant] must be found not guilty." (Alteration in original). We stated that:

> Relying principally on *West v. State*, 312 Md. 197, 539 A.2d 231 (1988), appellant claims that the refusal to give that additional instruction constitutes reversible error. We do not agree.
>
> The principle at issue is a simple one. As stated in *Wilson v. State*, 319 Md. 530, 536–37, 573 A.2d 831 (1990):
>
> > "A conviction may rest on circumstantial evidence alone.... To ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, we have long held that a conviction upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence."
>
> The validity of that principle is not in question; at issue is whether it is the proper subject of a jury instruction.

*Hebron*, 92 Md.App. at 512–13, 608 A.2d 1291. In *Hebron*, this Court stated that "only in that limited situation 'where the State's proof of guilt depends exclusively upon a single strand of circumstantial evidence' must it exclude every reasonable hypothesis of innocence." *Id.* at 515, 608 A.2d 1291. This is not a case involving a single strand of circumstantial evidence, and as such the court properly denied the motion for judgment of acquittal.

after numerous searches and nationwide media coverage to locate her, is evidence substantiating the first element of *corpus delicti—i.e.* that Tracey is dead. "[T]he independent evidence of the *corpus delicti* 'may be circumstantial in nature when direct evidence is not available,' and there is no reason to believe that this statement does not apply to the fact of death with the same force as it does to the criminal causation." *Id.* at 486, 433 A.2d 1179 (citations omitted).

Combined with the facts set forth above, the following circumstantial evidence more than establishes the first element of *corpus delicti:* (1) Tracey was extremely close to her friends and family, especially her grandmother; (2) Tracey has not been heard from since March 2005, despite testimony from Tracey's friends and family members about how reliable and responsive she was when called and how often she saw and spoke with those friends and family members; (3) Tracey's dogs were left at her home, despite testimony revealing that Tracey "loved her dogs" and they were like her children; (4) Tracey's Trans Am was found abandoned in a Days Inn parking lot, despite testimony that Tracey loved and took care of her Trans Am; (5) Spadaro testified that she was moving in with Tracey at the end of May 2005; (6) Cataldi testified that Tracey had told her prior to her disappearance that she had seen a divorce lawyer; (7) witnesses testified that Tracey made future plans to attend a baby shower in April 2005—for which she already bought presents—and to attend a party at Baptiste's house; (8) appellant told a friend that Tracey had picked up Easter baskets for appellant's children and they were having a birthday party for appellant's daughter; and (9) when discussing appellant moving out, Tracey informed a friend that she "had already put things on layaway so that when [appellant] took things out of the house that she could just replace whatever he took."

As to the second element of *corpus delicti*—that the death occurred under circumstances which indicate that it was caused criminally by appellant—the evidence established that: (1) appellant made inconsistent statements concerning his

activities on the day Tracey disappeared—during the first interview, telling Detective Marll he stayed at home all day, omitting that he traveled to Cycle World, within a mile and a half of where Tracey's Trans Am was discovered. During a second interview, appellant advised for the first time that he did leave home and go to Cycle World; and during a third interview, for the first time, appellant explained that Haven had come to his house; (2) appellant advised Detective Marll during the third interview that "nothing happened" in the house; (3) Tracey's Trans Am was recovered approximately a mile and a half from Cycle World; (4) cell phone records revealed that the 7:48 p.m. call from Tracey's cell phone on March 6, 2005, was made while the phone was traveling southbound through the Harbor Tunnel; (5) the Days Inn videotape showed an image of someone leaving Tracey's Trans Am in the parking lot of the Days Inn and that the car's headlights flashed seconds later, indicating that a keyless entry remote was used to lock the car; (6) the time on the videotape from Days Inn, under Daylight Savings Time, was 8:01 p.m.; (7) on March 17, 2005, appellant was in possession of the keyless entry remote to the Trans Am, wordlessly giving the remote to Detective Marll; (8) evidence at trial included a receipt indicating that a "singular" keyless entry remote had been ordered for Tracey's Trans Am; (9) appellant was aware of Tracey's affair with Christian; (10) Tracey had asked appellant to move out; (11) appellant moved items from storage lockers back into his house as soon as two weeks after Tracey disappeared; and (12) shortly after Tracey's disappearance, appellant engaged in a conversation with Pittman regarding appellant's desire to purchase an expensive boat, referring in the same conversation to Tracey's life insurance of which he claimed to be the beneficiary.

Appellant's own testimony revealed that he had confronted both Tracey and Christian regarding their affair and lied to law enforcement officers regarding how he obtained Christian's address and information. Appellant admitted to having Tracey followed, tapping the house phone without Tracey's knowledge, asking Tracey's supervisor, Liebermann, to keep

an eye on Tracey's calls and to alert him if anything suspicious occurred, and going through Tracey's desk at work. Payne testified that appellant would call Tracey's work "asking what time did Tracey clock out last night. Because he was, like, watching her." Barilla testified that "Tracey couldn't go anywhere without [appellant] constantly calling her, asking where is she, who is she with, where is she going to be, how long is she going to be there. . . . She would get really upset, which I don't blame her, you know. It wasn't just after things were breaking up, it was from the beginning." Liebermann testified that he played a call between Tracey and Christian and appellant "was antsy, kind of like pacing a little bit." According to Liebermann, while appellant listened to the call appellant said "he wasn't going to go through this again and there's three things he doesn't like, he doesn't like a liar, a cheat, and he doesn't want anybody to take his money." Appellant admitted that he did not participate in the searches for Tracey and he tore down fliers that were on his car and mailbox.

Regarding the question before us—the sufficiency of the evidence to establish second-degree murder—the circumstantial evidence was more than sufficient to permit a rational trier of fact to conclude that Tracey is dead and that appellant caused her death. As we noted in *Hurley,* 60 Md.App. at 552, 483 A.2d 1298, "[w]orldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, 'go underground,' and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight equal to that of bloodstains and concealment of evidence." (Citation omitted). The jury was well within its province to resolve any factual disputes in favor of the State. Taking the evidence in the light most favorable to the State, in addition to other facts, the evidence established one keyless entry remote used by the person departing Tracey's vehicle at 8:01 p.m. on March 6, 2005, and that appellant was, afterward, in possession of the

remote when the vehicle was recovered, and that Tracey was dead—with appellant having caused her death. Prior to closing argument, the jury was instructed, in pertinent part, that:

> Motive is not an element of the crime charged and need not be shown. However, you may consider the motive or lack of motive as a circumstance in this case. **Presence of motive may be evidence of guilt.** Absence of motive may suggest innocence. You should give the presence or absence of motive, as the case may be, the weight that you believe it deserves.

(Emphasis added). Although the State argued primarily at trial that all of the facts set forth above demonstrate the premeditation necessary for first-degree murder, the facts, including those evidencing appellant's motive, intent, and conduct, are more than sufficient to support a conviction for second-degree murder.

## III. Cross–Examination

Appellant contends that the circuit court erred in limiting his cross-examination of several witnesses—specifically, Regina Gardner and Detective Marll—as to whether Tracey "had run away from home in the past" and whether "she was seen by witnesses after the date the State claimed she was murdered." Appellant argues that testimony that Tracey had run away in the past and that she was reportedly seen in Pennsylvania after March 6, 2005, was relevant to the case.

The State responds that this issue is not preserved for appellate review. The State argues that after the circuit court sustained its objections appellant failed to proffer the substance and relevance of the allegedly excluded evidence. The State asserts that "regardless of the relevance of the evidence [appellant] sought to elicit, it is clear from the record that the evidence he sought to have admitted through his cross-examination of Detective Marll was [hearsay and] not otherwise admissible."

Initially, we conclude that this issue is not preserved for appellate review. Maryland Rule 5–103(a) provides that:

(a) Effect of erroneous ruling. Error may not be predicated upon a ruling that admits or excludes evidence unless the party is prejudiced by the ruling, and

(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was requested by the court or required by rule; or

(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer on the record or was apparent from the context within which the evidence was offered. The court may direct the making of an offer in question and answer form.

In *Muhammad v. State,* 177 Md.App. 188, 281, 934 A.2d 1059 (2007), *cert. denied,* 403 Md. 614, 943 A.2d 1245 (2008), this Court stated that:

Even as of this late date, Muhammad has not proffered to us on this appeal what his out-of-state witnesses would likely have testified about. **A claim that the exclusion of evidence constitutes reversible error is generally not preserved for appellate review absent a formal proffer of the contents and materiality of the excluded testimony.** Maryland Rule 5–103(a)(2); *Merzbacher v. State,* 346 Md. 391, 416, 697 A.2d 432 (1997) (objection to exclusion of evidence unpreserved where appellate court is in no position to discern what the evidence may have been); *Ratchford v. State,* 141 Md.App. 354, 368, 785 A.2d 826 (2001), *cert. denied,* 368 Md. 241, 792 A.2d 1178 (2002) (failure to proffer contents of excluded testimony is "absolutely foreclosing" as to claims). This impediment to appellate review effectively moots any consideration, as an alternate holding, of harmless error. Even if, *arguendo,* certification for the out-of-state witnesses had been erroneously denied, we have no idea whether such a hypothesized error would have been harmful or harmless because we have no idea what the excluded testimony might have been.

In this case, appellant contends that "the evidence [he] sought to introduce was clear from the questions asked" and, as such, a proffer of the answers sought was not necessary. We disagree. During the cross-examination of Gardner, Tracey's stepmother, appellant asked: "Did she [Tracey] have run-away problems with you all[,]" and during the cross-examination of Detective Marll, appellant asked: "And you went and interviewed Mr. Kerr about [Tracey] being in Pennsylvania[,]" and "Now, did you ever go out and interview a Thomas Tyler ... And that was another in regard to this, a report of [Tracey] in this case, a report of [Tracey]." After all three of these questions, the State objected, and the circuit court sustained the objections. Appellant's counsel continued cross-examination without offering a formal proffer of the content and materiality of the excluded testimony. As such, a claim that the exclusion of evidence constitutes reversible error is not preserved for review. *Muhammad*, 177 Md.App. at 281, 934 A.2d 1059.

Alternatively, we perceive no abuse of discretion. "Generally speaking, the scope of examination of witnesses at trial is a matter left largely to the discretion of the trial judge and no error will be recognized unless there is clear abuse of such discretion." *Oken v. State*, 327 Md. 628, 669, 612 A.2d 258 (1992), *cert. denied*, 507 U.S. 931, 113 S.Ct. 1312, 122 L.Ed.2d 700 (1993) (citation omitted). Maryland Rule 5–611(b)(1), provides that:

(1) Except as provided in subsection (b)(2), cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. Except for the cross-examination of an accused who testifies on a preliminary matter, the court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

In *Grandison v. State*, 341 Md. 175, 206, 670 A.2d 398 (1995), the Court of Appeals instructed that: "The determination of relevance is reserved for the discretion of the trial judge; we will not disturb the trial judge's ruling unless he has abused

that discretion." (Citations omitted). In *Thomas v. State,* 143 Md.App. 97, 115, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002), we stated that: "A judge must allow a defendant wide latitude to cross-examine a witness as to bias or prejudices, *but the questioning must not be allowed to stray into collateral matters which would obscure the trial issues and lead to the factfinder's confusion."* (Emphasis in original).

In this case, appellant's question to Gardner—"[d]id [Tracey] have run-away problems with you all[ ]"—referred to Gardner's experience with Tracey as a child. During cross-examination, appellant's counsel asked Gardner when Tracey lived with her, and Gardner responded that Tracey lived with her from 1981, when Tracey was ten years old, to when Tracey was about fifteen or sixteen years old. As such, the question would necessarily have elicited testimony about a time-period when Tracey was between the ages of ten and approximately fifteen or sixteen years old. Tracey was born on March 21, 1971, and disappeared on March 6, 2005. At the time of her disappearance, Tracey was two weeks away from being thirty-four years old. That Tracey did or did not run-away from home between the ages of ten to fifteen or sixteen has no relevance to Tracey's disappearance as a thirty-three, almost thirty-four year old woman. Whether or not Tracey ever ran away between the ages of ten and sixteen—a question to which we do not know what Gardner's answer would have been, as appellant's counsel failed to make a proffer—is of no relevance, and we find no clear abuse of discretion in the circuit court sustaining an objection to this question.

During cross-examination, after Detective Marll testified that he interviewed Kerr and Tyler, appellant's counsel asked: "And you went and interviewed Mr. Kerr about [Tracey] being in Pennsylvania[ ]" and "Now, did you ever go out and interview a Thomas Tyler ... And that was another in regard to this, a report of [Tracey] in this case, a report of [Tracey]. The State objected. We conclude that the circuit court properly exercised its discretion in sustaining the objec-

tion.[23] The testimony appellant's counsel ultimately sought to elicit—information given to the Detective Marll by Kerr and Tyler—was hearsay and not otherwise admissible, *i.e.* any attempt by appellant's counsel to elicit information Kerr or Tyler provided would have resulted in hearsay testimony. We, therefore, perceive no abuse of discretion on the part of the circuit court in sustaining the objection.

## IV. Jury Instructions

Appellant argues that the circuit court improperly instructed the jury on circumstantial evidence. Appellant asks this Court for plain error review. Appellant contends that the jury instruction on circumstantial evidence deviated "significantly from the pattern jury instruction" and "resulted in conflicting definitions."

The State responds that the circumstantial evidence instruction given by the circuit court, when read as a whole and in context, "was a correct statement of the law." [24]

Md. Rule 4–325(e), however, provides that this Court has the discretion to recognize plain error in jury instructions, despite a failure to make an objection. This Court has stated that "we possess plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." *Danna v. State,* 91 Md.App. 443, 450, 605 A.2d 150, *cert. denied,* 327 Md. 627, 612 A.2d 257 (1992). In *Boulden v. State,* 414 Md. 284, 313, 995 A.2d 268 (2010), the Court of Appeals stated:

> We decline to review the claimed error under a "plain error" analysis. "Such review is reserved for those errors

---

**23.** To the extent appellant may contend that the court improperly sustained the objection, in that the questions, ruled upon by the court, did not require the witness to give the substance of the interview, we find no error. Detective Marll had already testified he interviewed Kerr and Tyler, and as such, the questions had been asked and answered.

**24.** The State contends that the issue is not preserved for review. As appellant requests plain error review, this is a concession that the issue is not preserved.

▮▮▮▮▮▮▮▮▮▮▮▮

> that are 'compelling, extraordinary, exceptional or funda-
> mental to assure the defendant of [a] fair trial.'" *Robinson*
> [*v. State*], 410 Md. [91,] at 111, 976 A.2d [1072,] at 1084
> [ (2009) ] (quoting *Rubin v. State,* 325 Md. 552, 588, 602 A.2d
> 677, 694 (1992)). We explained further in *Robinson* that
>
> [w]e will intervene in those circumstances only when the
> error complained of was so material to the rights of the
> accused as to amount to the kind of prejudice which
> precluded an impartial trial. In that regard, we review
> the materiality of the error in the context in which it
> arose, giving due regard to whether the error was purely
> technical, the product of conscious design or trial tactics
> or the result of bald inattention.

(Alterations in original).

Maryland appellate courts have often been called upon to exercise the discretion to recognize plain error; however, neither the Court of Appeals nor this Court has chosen to do so except in a few egregious cases. In *State v. Rich,* 415 Md. 567, 578–79, 3 A.3d 1210 (2010), the Court of Appeals stated that plain error review involves four steps or prongs:

> First, there must be an error or defect—some sort of
> [d]eviation from a legal rule—that has not been intentionally
> relinquished or abandoned, i.e., affirmatively waived, by the
> appellant. Second, the legal error must be clear or obvious,
> rather than subject to reasonable dispute. Third, the error
> must have affected the appellant's substantial rights, which
> in the ordinary case means he must demonstrate that it
> affected the outcome of the district court proceedings.
> Fourth and finally, if the above three prongs are satisfied,
> the court of appeals has the discretion to remedy the error-
> discretion which ought to be exercised only if the error
> seriously affect[s] the fairness, integrity or public reputation
> of judicial proceedings. Meeting all four prongs is difficult,
> as it should be.

(Quoting *Puckett v. United States,* 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009)) (citations and internal quotation marks omitted).

██ In this case, appellant takes issue with the following instruction given by the circuit court at trial:

There are two types of evidence, direct and circumstantial. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence.

**Circumstantial evidence need not be such that no possible theory other than guilt can stand. It is not necessary that the circumstantial evidence exclude every possibility of the Defendant's innocence,** or produce an absolute certainty of guilt. While it must afford a basis for an inference of guilty beyond a reasonable doubt, it is not necessary that each circumstance standing alone be sufficient to establish guilt, but the circumstances are to be considered collectively.[25]

In reaching a verdict, you should weigh all of the evidence presented, whether direct or circumstantial. You may not convict the Defendant unless you find that the evidence, when considered as a whole, establishes guilt beyond a reasonable doubt.

**A conviction based upon circumstantial evidence alone is not to be sustained unless the circumstances taken together are inconsistent with any reasonable hypothesis of innocence.**[26]

(Emphasis added).

Maryland Criminal Pattern Jury Instruction 3:01, entitled: "Direct and Circumstantial Evidence," provides as follows:

---

**25.** This paragraph was included in the State's requested jury instruction number six and the language was taken from *Hebron,* 92 Md.App. 508, 608 A.2d 1291.

**26.** When counsel and the trial judge were reviewing the jury instructions requested by counsel, appellant's counsel stated: "Your Honor, that's a direct quote from *Williams.* I know he didn't say it went, but it's a direct quote from *Williams.* **We'd push that be put in there** because—[.]" (Emphasis added). As such, this language was specifically requested by appellant's counsel to be included, and the language

There are two types of evidence—direct and circumstantial. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. No greater degree of certainty is required of circumstantial evidence than of direct evidence. In reaching a verdict, you should weigh all of the evidence presented, whether direct or circumstantial. You may not convict the defendant unless you find that the evidence, when considered as a whole, establishes guilt beyond a reasonable doubt.

Although appellant contends that the instruction given by the circuit court varies from the pattern jury instruction in the areas in bold above, we find no merit in appellant's contention that plain error review is warranted. The two paragraphs with which appellant takes issue are accurate statements of law and, as such, there is no support for a conclusion that there was any error or deviation from a legal rule that had not been intentionally relinquished or abandoned—the first prong under *Rich*, 415 Md. at 578, 3 A.3d 1210. In *Williams*, 342 Md. at 735, 679 A.2d 1106, the Court of Appeals discussed the sufficiency of evidence to sustain a conviction, stating:

> While it is true that ... a conviction may rest on circumstantial evidence alone, we have also explained:
>
> > to ensure that the trier of fact bases a finding of guilt on the appropriate degree of certainty, ... a conviction [based] upon circumstantial evidence *alone* is not to be sustained unless the circumstances, taken together, are inconsistent with any reasonable hypothesis of innocence.

(Citing *Oken*, 327 Md. at 662–63, 612 A.2d 258) (quotation marks omitted) (alterations, emphasis, and omissions in original). The language in the jury instruction providing that: "A conviction based upon circumstantial evidence alone is not to be sustained unless the circumstances taken together are inconsistent with any reasonable hypothesis of innocence" is taken directly from *Williams* and a quote that appellant

---

was derived from *Williams v. State,* 342 Md. 724, 679 A.2d 1106 (1996), *overruled on other grounds as stated in, Wengert v. State,* 364 Md. 76, 771 A.2d 389 (2001).

specifically sought the circuit court to include in the instruction.

In *Hebron*, 92 Md.App. at 514–15, 608 A.2d 1291, this Court stated:

The Court of Appeals seems clearly to have adopted the general underlying premise that, in terms of quality, there is no difference between direct and circumstantial evidence. Quoting with approval from *Nichols v. State*, 5 Md.App. 340, 350–51, 247 A.2d 722 (1968), *cert. denied*, 253 Md. 735 (1969), the Court stated in *Gilmore v. State*, 263 Md. 268, 292–93, 283 A.2d 371 (1971), *vacated in part, Gilmore v. Maryland*, 408 U.S. 940, 92 S.Ct. 2876, 33 L.Ed.2d 763 (1972):

The law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existence of a fact may be inferred. No greater degree of certainty is required when the evidence is circumstantial than when it is direct, for in either case the trier of fact must be convinced beyond a reasonable doubt of the guilt of the accused . . . .

[C]ircumstantial evidence need not be such that no possible theory other than guilt can stand. . . . It is not necessary that the circumstantial evidence exclude every possibility of the defendant's innocence, or produce an absolute certainty in the minds of the jurors.

(Quotations marks omitted) (alterations and omissions in original). The language in the jury instruction—stating: "Circumstantial evidence need not be such that no possible theory other than guilt can stand. It is not necessary that the circumstantial evidence exclude every possibility of the Defendant's innocence, or produce an absolute certainty of guilt[ ]"—is a quote directly from *Hebron* and a quote to which appellant's counsel specifically advised the circuit court he had no objection. Under these circumstances, we will not exercise plain error review.

Demonstrating further appellant's failure to satisfy the conditions necessary for plain error review is that to the extent appellant alleges the circuit court erred in giving the jury

instruction on circumstantial evidence, there is no contention that the error was clear or obvious. When the circuit court discussed with counsel the State's requested jury instruction number six—regarding circumstantial and direct evidence— the court asked: "With the decision, it's *Hebron versus State* at 331 Md.App. [Md.] 219 [627 A.2d 1029], one paragraph, you don't object to that, [appellant's counsel]?" Appellant's counsel responded: "No, Your Honor." A review of the record demonstrates that not only did appellant's counsel fail to object to the jury instruction given, but counsel specifically conceded that he did not object to the language based on *Hebron.* The last paragraph of the instruction with which appellant now takes issue consisted of language derived from *Williams,* and was proposed and asked to be included by appellant's counsel. Concerning this language, appellant's counsel stated: "Your Honor, that's a direct quote from *Williams.* I know he didn't say it went, but it's a direct quote from *Williams.* We'd push that be put in there because[.]"

After the instructions were given, appellant's counsel stated at a bench conference: "For the record the Defense would object to what we consider to be the incomplete spoliation instruction and incomplete circumstantial evidence instruction, which were already argued before in open court." This was not an objection or exception to the content of the instruction given by the circuit court to which it earlier agreed, but rather, apparently, an objection that the instruction failed to contain additional information. Counsel provided no information or explanation as to the grounds on which he contended the instruction to be incomplete. Appellant's counsel's specific agreement to the instruction containing language of *Hebron,* his requested inclusion of language derived from *Williams,* and the failure to object to any language contained in the instruction, supports the conclusion that appellant failed to satisfy the second prong of plain error review under Rich-that the alleged legal error must be clear or obvious, rather than subject to reasonable dispute.[27]

---

27. We find unpersuasive appellant's contention that the failure of his counsel to object to the State's "misleading and confusing" instruction

## V. Closing Remarks

Appellant contends that the circuit court erred in permitting the State to argue case law in closing argument. Appellant takes issue with the prosecutor, over objection, arguing a quote from *Hurley*, 60 Md.App. at 552, 483 A.2d 1298, that: "The unlikelihood of such a voluntary disappearance is evidence—it's circumstantial evidence that you can give weight to. The law says that you can give it weight equal to that of blood stains of evidence—[.]"

The State responds that the prosecutor's closing argument did not deprive appellant of a fair trial. The State contends that the prosecutor "focusing on the fact that the evidence in this case was largely (although not exclusively) circumstantial, included in his argument a statement, consistent with the court's instructions, that the circumstantial evidence in this case was entitled to be given the same weight as evidence of bloodstains." The State argues that appellant was not prejudiced by the remark because the comment did not "actually mislead" or influence the jury as it was a correct statement of law. The State asserts that if error at all, the error was harmless.

In *McFadden v. State*, 197 Md.App. 238, 255, 13 A.3d 68 (2011), this Court explained: " 'The regulation of argument rests within the sound discretion of the trial court.' " (Quoting *Grandison*, 341 Md. at 224, 670 A.2d 398). Maryland Rule 4–325(c) provides that:

(c) How given. The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. . . .

In *Newman v. State*, 65 Md.App. 85, 101–02, 499 A.2d 492 (1985), *cert. denied*, 305 Md. 419, 504 A.2d 1152 (1986), we held

---

constitutes ineffective assistance of counsel. As discussed above, appellant's counsel agreed to the instruction. As with the ineffective assistance of counsel claim regarding Juror No. 289, the validity of this ineffective assistance of counsel claim cannot be determined without the opportunity for fact-finding. Accordingly, we will not review the issue on direct appeal.

that the trial court properly prevented the defendant's counsel from quoting a passage on reasonable doubt from a Supreme Court opinion during closing argument. We stated that: "Arguing law includes stating, quoting, discussing or commenting upon a legal proposition, principle, rule or statute." *Id.* at 102, 499 A.2d 492 (citation omitted). We held that, "unless there exists a dispute as to the proper interpretation of the law of the crime for which there is a *sound basis*, the court's instructions as to the law are binding on the jury and counsel as well." *Id.* at 101, 499 A.2d 492 (citation and internal quotation marks omitted) (emphasis in original). This Court stated:

> Accordingly, to hold that counsel are permitted to read caselaw regarding the definition of reasonable doubt to a jury, whose only function is to determine the facts and, if appropriate, the law of the case, would be to permit the usurpation of the court's function and to again place a broader law-judging function in the jury. This, we cannot and will not do. The court committed no error, plain or otherwise.

*Id.* at 103, 499 A.2d 492.

Following *Newman*, in *White v. State*, 66 Md.App. 100, 118, 502 A.2d 1084 (1986), this Court stated:

> *Newman* teaches that counsel may argue law to the jury only where a dispute, as defined in *Montgomery* and *Stevenson*, exists as to the law of the crime. 65 Md.App. at 101, 499 A.2d 492. *See also Woodland v. State*, 62 Md.App. 503, 512–14, 490 A.2d 286 (1985); Rule 4–325(f). We interpret *Newman* to mean that where there is no dispute as to the law, counsel will not be permitted to argue law even where the argument is "consistent" with the court's instructions. . . . Counsel are provided input as to the content of the instructions before they are given, and also may object if an instruction is not to counsel's satisfaction. Md.Rule 4–325. To allow counsel to embellish the trial court's instructions is fraught with the danger that the trial judge's binding instructions will be manipulated by counsel, result-

ing in the jury applying law different than that given by the trial court.

In *White*, 66 Md.App. at 120, 502 A.2d 1084, we determined that "the prosecutor argued the legal concepts of reasonable doubt and circumstantial evidence [and u]nder *Montgomery* and *Stevenson* neither of these areas is subject to dispute as the law of the crime, and the trial court's instructions were therefore binding." [28] We stated: "The due process requirement of reasonable doubt is expressly listed as not being part of the law of the crime subject to dispute, and we hold that an instruction defining circumstantial evidence is in that category. The definition of circumstantial evidence is applicable in every case is within the court's province; the jury only decides how to apply the facts of a particular case to the concept." *Id.* We held that the trial court erred in allowing the prosecutor in closing argument to argue law explaining reasonable doubt and circumstantial evidence. *Id.*

In this case, similar to our determination in *White*, we conclude that the circuit court erred in overruling appellant's counsel's objection to the prosecutor arguing law. Although we conclude that the circuit court erred in failing to sustain appellant's counsel's objections, we must now ask

---

**28.** Recently, in *Unger v. State*, 427 Md. 383, 48 A.3d 242, 2012 WL 1868904, 2012 Md. LEXIS 295 (2012), a case involving the interpretation of Article 23, paragraph one, of the Maryland Declaration of Rights, the Court of Appeals overruled the Court's prior holding in *Stevenson v. State*, 289 Md. 167, 423 A.2d 558 (1980), reaffirmed in *Montgomery v. State*, 292 Md. 84, 437 A.2d 654 (1981), and *State v. Adams*, 406 Md. 240, 958 A.2d 295 (2008), "that the *Stevenson* interpretation of Article 23 did not set forth a new constitutional standard." *Id.* at 390, 48 A.3d 242, 2012 WL 1868904 at *2, 2012 Md. LEXIS 29 at *6. Specifically, the Court held: "Those portions of the Court's *Stevenson, Montgomery*, and *Adams* opinions, holding that the interpretation of Article 23 in *Stevenson* and *Montgomery* was not a new State constitutional standard, were erroneous and are overruled." *Id.* at 417, 48 A.3d 242, 2012 WL 1868904 at *18, 2012 Md. LEXIS 29 at *53–54. In *Unger*, the Court of Appeals did not determine that the holdings of *Stevenson* and *Montgomery* as to the binding nature of the trial court's instructions were erroneous, nor did the Court abrogate our holding in *White* that counsel may argue law to the jury only where a dispute exists as to the law of the crime.

whether the prosecutor's improper argument constitutes reversible error. In *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976), the Court of Appeals stated:

> When an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

"The harmless error standard is highly favorable to the defendant, and 'the burden is on the State to show that [the error] was harmless beyond a reasonable doubt' and did not influence the outcome of the case." *Perez v. State*, 420 Md. 57, 66, 21 A.3d 1048 (2011) (citations omitted) (alteration in original). In *Perez*, the Court of Appeals instructed that in "[a]pplying *Dorsey* and its progeny, we must determine, based on the record, whether the error possibly influenced the verdict in this case." *Id.* at 76, 21 A.3d 1048.

 Returning to the case at hand, we must determine whether, in light of the evidence presented and the instructions given, the error was harmless beyond a reasonable doubt. We note that at the beginning of instructing the jury, consistent with Maryland Rule 4–325(c), the circuit court advised the jury as to the binding nature of the instructions, as follows: "It is your duty as jurors to follow the law as I state it to you and to apply the law to the facts as you find them from the evidence that you've heard in this case. . . . It would be a violation of your duty to base your verdict upon any view of the law other than that given by me in these instructions."

The prosecutor remarked in closing arguments that: "The unlikelihood of such a voluntary disappearance is evidence—it's circumstantial evidence that you can give weight to. The law says that you can give it weight equal to that of blood

stains of evidence[.]" With this remark, the prosecutor emphasized the court's instruction that: "The law makes no distinction between the weight to be given to either direct or circumstantial evidence." In this case, similar to the improper argument in *White,* "[t]he prosecutor did not go beyond the law of the case by presenting argument which substantively altered the binding instructions, but merely helped define the concept of circumstantial evidence. The jury would have applied the same concepts of the law even if the prosecutor had not read the case law on circumstantial evidence[.]" 66 Md.App. at 123, 502 A.2d 1084. The prosecutor's argument as to the law was neither incorrect nor materially inconsistent with the circuit court's instructions. We conclude that the error was harmless beyond a reasonable doubt as the State did not exceed the law of the case.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**